### SPLAWN et al. v. WOODARD et al. (No. 7083.)

(Court of Civil Appeals of Texas. Austin. Oct. 13, 1926. Rehearing Denied Nov. 3, 1926.)

**1. Evidence ⬅29.**

It is common knowledge that tract used for main branch of University at Austin was set aside for campus purposes by commissioners, surveying seat for government under enactment of Texas Republic (Acts Republic 1838–39, p. 36).

**2. Colleges and universities ⬅6(5)—Where tract had been set aside for University campus purposes, no trust or condition on its use as such could be imposed by regents without legislative grant (Acts Republic 1838–39, p. 36; Acts 1881, c. 75, §§ 5, 15).**

Where tract had been set aside as University campus by commissioners, who surveyed site for seat of government under enactment of Texas Republic (Acts Republic 1838–39, p. 36), no trust on its use as such could be imposed by regents without legislative grant, in view of sections 5 and 15 of Acts 1881, c. 75, establishing University.

**3. Colleges and universities ⬅6(5).**

Where power to impose trusts or conditions on University campus tract was not expressly

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

granted, it could not be presumed, where not necessarily incident to power expressly granted.

**4. Colleges and universities ⟺6(5).**

Regents have full discretionary power over buildings on University campus, subject to review by Legislature, but not by courts, except in case of palpable abuse, in view of Acts 1881, c. 75, and Rev. St. 1925, arts. 2592, 2593.

**5. Colleges and universities ⟺10.**

Evidence *held* not to show intention to create trust on part of either regents or donor of money used to build dormitory at State University.

**6. Colleges and universities ⟺6(5)—If donation of money to build dormitory at State University and its acceptance be construed as creating trust, use of building as dormitory for 36 years held fulfillment of trust.**

If donation of money and its acceptance for purpose of building dormitory at State University be construed as creating trust or imposing conditions on use of building, use of it as dormitory for 36 years *held* a fulfillment of trust and full compliance with conditions, so that building could be then used for other purposes.

**7. Colleges and universities ⟺10.**

Evidence, showing only arrangement between students and dormitory hall manager at University for reservation of rooms at dormitory terminable at will of either party, *held* not to show contract with University.

**8. Colleges and universities ⟺6(5).**

Rights acquired by students by making nominal deposit for rooms in dormitory at State University *held* not to support injunction depriving regents of inherent power to discontinue use of building as dormitory.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by Percy P. Woodard and others against W. M. W. Splawn and others. From an interlocutory order granting a temporary injunction, defendants appeal. Order set aside, and temporary injunction dissolved.

Dan Moody, Atty Gen., Geo. E. Christian, Asst. Atty. Gen., and W. A. Keeling, of Austin, for appellants.

Victor Gleckler and Cofer & Cofer, all of Austin, and L. Hamilton Lowe, of Corpus Christi, for appellees.

McCLENDON, C. J. Appellees, plaintiffs below, are students or prospective students of the University of Texas, who have made reservation for lodging in B Hall for the 1926–1927 long session. Appellants, defendants below, are the members of the board of regents and president of the University and a contractor whom the University authorities have engaged to make repairs upon the building in question.

The contentions upon which appellees assert their right to the injunction are: (1) That the gift to the University of the fund from which B Hall was in the main originally constructed created a trust, or, in any event, imposed limitations upon the use of the property, requiring that it be perpetually used as a dormitory for University students of limited means, and that the regents were therefore without power to alter the building so as to make it unsuited to such use; and (2) that appellees had binding contracts with University authorities for quarters during the 1926–1927 long session, and were entitled to the injunction in order to preserve their contractual rights.

We have reached the conclusion that the trial court's order must be set aside and the temporary injunction dissolved upon the following holdings:

(1) The 40 acres upon which the main branch of the University at Austin was first established was set aside for campus purposes and no trust or condition upon its use as such could be imposed without legislative grant.

(2) The board of regents are invested by law with the authority and duty to govern the University, and the matter of determining what buildings are to be placed upon the campus, their arrangement, and changes and alterations to be made therein, is vested in the regents, whose discretion in that regard is subject only to legislative control. The courts have no power to interfere with the decisions of the board in that regard, so long as they do not transcend powers and duties conferred upon them by law.

(3) The terms under which the donation of the fund for erecting Brackenridge Hall was made do not evidence the creation of a trust or the imposition of conditions which would in any way abridge the full power of the regents to determine the advisability of changing the uses of the building from those for which it was originally constructed, or limit in any way their discretion in that regard.

(4) If the donation and its acceptance were construed as creating such trust or imposing such conditions, the use of the building for the purpose originally designed for a period of 36 years must be considered as a fulfillment of the trust and full compliance with the conditions.

(5) The evidence does not show a contract on the part of the appellees.

(6) Such contract, if shown, could not be enforced by injunction.

[1] The facts which control the decision are not controverted. While no attempt was made to show in what way the University or state deraigned its present title to the University campus, it is conceded that the title is in the state or University for campus purposes, and it may well be regarded as a matter of common knowledge that the tract was set aside and designated for that purpose by the commissioners who under enactment of the Texas Republic surveyed the site for the

⟺For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

seat of government. See Act of January 14, 1839. The Act of 1881 (Acts 17th Leg. c. 75), establishing the University, provided for location of the main branch and the medical department by popular vote, by which the main branch was located at Austin, and from that time the tract in question has been used for campus purposes. By section 5 of that act the government of the University was vested in a board of regents, whose duties were set forth in sections 15 and following of the act. Among the duties thus imposed were: To establish the departments of the University; to define the general plan of University buildings; advertise for bids; and proceed as soon as practicable to the erection of the buildings. The only directions or limitations which the act appears to have contained with reference to buildings were that they should be "substantial and handsome, but not loaded with useless and expensive ornamentation," not to cost over $150,000, and that they should "be so constructed as to admit of additions thereto without marring the harmony of the architecture."

The first session of the University for students was that of 1883–1884. According to the testimony of Judge Batts:

"At the time of the starting out of the University here the facilities for taking care of the young men and women were very limited. It was also the case that most of the students were rather poor. Among the students were two by the name of Shugart and Melson. Mr. Melson is now district judge in Hopkins county, if I am not mistaken. They instituted a mess, and the results of their efforts were published by the University authorities, indicating, as I now recall it, that they had lived for a month on something like $8. As a result of their efforts, two or three mess halls were established; one, I remember, was at the place where the Christian Science Church is at this time. This enabled a number of young men of Texas to attend the University who could not otherwise have been there, I am quite sure; of course, that is a conclusion of mine. But the result of it was that the University authorities began a discussion of the matter of other mess halls for the students. One who was especially interested in it was Dr. Leslie Waggener, chairman of the faculty at the time. As the result, Mr. Brackenridge proposed to put up a mess hall and dormitory for the students; it was accepted by the University regents, and what has been known since as B Hall was erected."

The following appears from the minutes of the meetings of the board of regents:

February 11, 1890:

"An urgent need for a mess hall represented to the board, a generous friend present offered to erect one for the benefit of the University, at his own cost, and to donate it to the institution. Whereupon the following resolution offered by Regent Simkins was unanimously adopted by the board, with much enthusiasm and cordiality towards the magnanimous donor:

" 'Whereas, a friend of the University of Texas has generously furnished means to construct one or more mess halls on the campus grounds to cost not exceeding the sum of $10,000, the executive committee is instructed to have suitable plans of said building at once prepared.

" '(2) The executive committee, when said plans are adopted, shall proceed at once to the erection of said building.

" '(3) That Regent Geo. W. Brackenridge be and he is hereby made a member of the executive committee of the board of regents.' "

From the minutes of June 17, 1890:

"It is with great pleasure that the faculty call attention in this report to the generous donation, from a private citizen of the state, of $15,000 for the purpose of erecting on the University campus a club house, by means of which the cost of living, while attending the University, can be brought within the reach of those whose resources are limited. The wish is expressed by the faculty that this munificent gift, the first of its kind in the history of the University, may lead to others from liberal citizens of Texas; and as an incentive to similar acts of generosity on the part of individuals, the hope is expressed that the donor will allow his name to be given to the building, now in the process of erection, as a perpetual recognition of his timely and thoughtful beneficence. A similar gift to erect a club house for young women would be most opportune. As we are now situated they are, in a certain sense, less able to reduce their necessary expenses than the young men, since they are restricted in their choice of boarding houses by other considerations than the price of board."

September 15, 1890:

"The building which is now being erected and which will be ready for occupancy November 1, 1890, will be of brick, trimmed with stone, four stories high, with mansard roof. It will be heated throughout by the Gurney hot water system, which will insure the greatest cleanliness with the greatest amount of comfort and safety. The lowest story or basement will contain a large dining room, 40x54, the kitchen, pantry, storeroom, etc. The other three stories will contain 24 rooms, each 22x15. These three stories will be divided by a solid brick partition into practically two buildings, each having its separate entrance, stairways, and corridors. In each of these buildings there will be on every floor a suite of 4 rooms opening upon a corridor, and to each suite of 4 rooms there will be accessible a water closet and bathroom, supplied at all hours with hot and cold water. Each room will have a large bay window, a roomy wardrobe, and be fitted up with gas fixtures. In short, the Brackenridge Club House will be supplied with every convenience and will be as attractive as a first class modern residence. It is expected that the occupants of the rooms will appreciate this effort to give them commodious and elegant apartments, and that they will heartily assist the faculty in the enforcement of such regulations as will keep the building free from disorder and wanton defacements."

Governor Ross, in his message to the Legislature January 15, 1891, said with reference to the University:

"The attendance has increased and the structures for which the Legislature made provision

have been completed in a substantial manner, and Maj. Brackenridge, a worthy citizen of San Antonio, recently added to its endowment by the erection of an elegant club house, costing $18,000, and I desire in this public way to give expression of my high appreciation of the generous act."

From the time of its construction up to the close of the long session of 1925–1926, it was used for the purpose of a dormitory for male students of limited means attending the University, a large percentage of whom were upper classmen and nearly all of whom were earning their living, in whole or in part, while attending the University by various kinds of employment.

As originally constructed the basement floor was used for dining room and kitchen, and the three floors above containing 24 rooms accommodating 48 students were used for sleeping quarters. About the year 1900 the building was enlarged so as to accommodate from 110 to 116 students by the addition of two wings, at a cost of $20,739.13, appropriated by the regents out of University funds. About 1912 the University authorities erected a cafeteria an the campus and the mess features of B Hall were abolished. From that time on the basement has been used as quarters for one of the University departments.

The board minutes of April 27, 1920, show a resolution to the effect that there were no difficulties arising from the terms of the gift to convert B Hall into an office and seminar building, and $45,000 or so much thereof as might be required was appropriated for that purpose. On June 7, 1920, the board rescinded this action; the minutes showing that it was voted "not to return the old Blind Institute property to the state at this time."

On April 20, 1926, the board approved a recommendation that B Hall be closed during the summer season of 1926 for necessary repairs. On June 7, 1926, estimates of the costs of repairing B Hall were submitted to the board. The estimate for use as a dormitory was $25,520 and that for use as a classroom and office building $25,000. In this connection the minutes recite:

"It was pointed out that the building was originally intended primarily for a mess hall, which purpose it no longer serves. It was further pointed out that the expense of repairing the building for continued use as a dormitory would entail an increase in the rates to the extent that living costs would not be appreciably lower than costs of living elsewhere in Austin. Again, the suggestion was made that the S. N. A. buildings, soon to come into the possession of the University, may be found suitable for use, in part, for dormitory purposes.

"Upon motion of Mrs. O'Hair, seconded by Mr. Neathery, the board voted unanimously (1) to appropriate $25,000 for the repair of Brackenridge Hall, (2) to use the building, when repaired, for offices and classroom purposes, and

(3) to continue to have the building known as Brackenridge Hall in honor of former Regent Brackenridge, who contributed $17,000 toward providing a mess hall for the University.

"Upon motion of Mrs. O'Hair the board voted to remit for the year 1926–1927 the fees of all students living in Brackenridge Hall during the long session of 1925–1926 who re-enter the University during the session of 1926–1927, and only for that year."

On July 3, 1926, bids for the repair of the building in accordance with the last minutes were opened and contracts awarded amounting to about $17,500. The minutes of this meeting recite:

"Previously the president had presented to the board various communications, some supporting the action of the board in voting to repair the building for use as classroom and office building, others objecting to the use of the building for any other than dormitory purposes. After a full discussion, it appeared that there was no reason for rescinding the action taken at the June meeting. The board accordingly proceeded with the letting of the contract."

"Upon motion of Mr. Neathery, the board voted to have returned the $1 deposited by applicants for rooms in Brackenridge Hall for the next long session."

In addition to the above documentary evidence, there were a number of witnesses who testified to statements made by Col. Brackenridge subsequent to the erection of the building. We will briefly refer to these statements, although we do not regard them as in any way throwing any light upon the issue of the creation of a trust or imposing of conditions upon the donation.

Dean T. U. Taylor, who was intimately acquainted with Col. Brackenridge, testified to a statement made by the latter at a dinner given at B Hall, as follows:

"After considerable hesitation Mr. Brackenridge arose and spoke about the destiny of the University and said he gave this hall to help poor boys in providing shelter and board as cheap as it could possibly be furnished."

Judge Batts quotes the substance of a statement of Col. Brackenridge as follows:

"He stated that he gave it to the young men of Texas for a dormitory and mess hall. Mr. Prather so stated, and Dr. Wooten, who was president of the board of regents, so stated. It was common knowledge among all the members of the faculty and the students and it was quite as well known as the circumstance that there is a capitol here."

The witnesses quite generally agreed that Col. Brackenridge, who was a member of the board of regents in 1890 and for many years thereafter, was present in Austin a number of times while the hall was being erected; that he always took a decided interest in the University and in B Hall up to the time of his death, which was after 1920; and that he was always averse to having his name attached to any donation made by him.

With reference to the proposed change in the building in 1920, Mr. Montague, who was at that time a student of the University and a resident of B Hall, testified that he called on the president of the University as soon as the announcement of the change in use of the building was made, to protest the change. He made no headway, and accordingly went to San Antonio and had a conference with Col. Brackenridge. In this conference the latter stated, in substance, that he had consented to remodeling of the building for other purposes on the representation that it was no longer suited for a dormitory. Upon being given certain statistics, however, by Mr. Montague, he assured him that the change would not be made, and that he would confer with the University president. In this conversation Mr. Montague quotes Col. Brackenridge as saying:

"That he really never placed a restrictive clause in the endowment, but had never considered it necessary because every one understood his purpose in building B Hall, and as long as he lived he intended to be actively interested in the University; he cited to us the fact that Dr. Vinson had requested his consent to the change as bearing out his opinion."

Mr. Montague further testified that he later had a conference with Dr. Vinson, who informed him that he had been to see Col. Brackenridge and the contemplated changes would not be made.

The records of the University show that the building originally cost $19,034.67, $17,000 of which was donated by Col. Brackenridge and the remainder paid out of University funds, and that thereafter additions and improvements to the building out of University funds were made as follows: During the year 1897–1898, $687; during the year 1898–1900, $20,739.13; during the year 1900–1901, $1,996.23. The building is carried on the University books at an inventory valuation of $49,600, $17,000 of which was contributed by Col. Brackenridge and $32,600 paid out of University funds. The operation of the hall showed a net annual profit over operating cost averaging about $1,000, but it was shown that the item of heating was not taken into account in these figures.

The method of renting rooms was somewhat as follows: One of the students residing at the hall was designated manager, who had the assignment of rooms. During the spring and summer of each year he took applications for the long session beginning the following fall. A deposit of $1 was required from each applicant as an evidence of good faith in order to secure his reservation, and the following form of receipt was given:

"University of Texas.

"Room Deposit Slip—University Hall.

"_____, _____.

"Received of ——, a deposit of $1.00 to be applied on rental of room No. —— for long session of ——, subject to the following conditions:

"If notification is made to the manager of the hall on or before September 15, of the intention on the part of the applicant not to return, this deposit will be refunded to said applicant.

"If no notification is made by the applicant of his intention not to return, the room will be held vacant until October 2, and thereafter only by the payment of one term's rental in advance.

"————, Manager of University Hall."

Each of the plaintiffs had made reservations, paid the $1 deposit fee, and been issued a receipt on the above form designating a specific room by number.

[2, 3] The first holding above is deduced from the statutes establishing the University and creating the board of regents as its governing body. The regents are clearly officers of the state charged with the duty of management and control of the University and its property. The campus tract was set aside for general uses in connection with the main branch of the University. There is nothing in the statutes which, either expressly or by implication, invest the regents with power to attach any trusts, limitations, or conditions to the title to that property or in any way to hamper or restrict its free use for campus purposes. Such power should not be presumed, in the absence of an express grant, unless necessarily incident to a power expressly granted. The property has been set aside as the seat of main branch of the University. The regents clearly would have no power to abandon it as such, dispose of it, or exchange it for another site; nor could they impress it, or any part of it, with a trust or restrictions, the effect of which might be to hamper them or their successors in the proper administration of the institution as they may determine wise and expedient to meet changes in conditions from time to time.

[4] The power of the board to erect buildings on the campus, determine their use, and make needed changes in their construction, location, and use, is clearly deducible from the statutes above referred to and those subsequently enacted. In addition to the noted provisions of the act of 1881, articles 2592 and 2593, R. S. 1925, are pertinent. By the former the regents are charged with the duty of spending the income from the permanent fund for "permanent improvements to be erected on the campus of the University of Texas," etc.; and by the latter they are directed in the manner of making contracts with "architects, planmakers, landscapers, or draftsmen," and concerning "all contracts for the construction or erection of such permanent improvements." We think it clear that the Legislature has delegated to the regents full discretionary powers over the buildings on the University campus, subject only to legislative review, and that their discretion in this regard is not a subject of court control, ex-

cept, perhaps, in case of palpable abuse, of which there is no suggestion in the present record.

[5] Nor do we think the record shows any intention on the part either of Col. Brackenridge or the regents to create a trust or impose any conditions which would attach to B Hall or the portion of the campus on which it was erected. Had the gift been real estate for a designated purpose, a different question would be presented. The gift here was of a sum of money to be expended in "erecting on the University campus a club house, by means of which the cost of living, while attending the University, can be brought within the reach of those whose resources are limited." The subject-matter of the gift was a sum of money, $17,000, to be used in the erection of a club house. The gift was expressly to the University. It may well be conceded that a trust was thereby created in the fund donated, and that it could not lawfully be diverted to a different purpose. No attempt, however, was made to do so. The fund was expended by the executive committee of the board, one of whose members was the donor himself, in literal compliance with the terms of the gift. There is nothing in the record which even suggests any intention upon the part of either donor or donee to transfer the trust character of the fund to the building or to the land on which it was erected. The very nature of the thing done and the consequences which must inevitably flow therefrom negative such intention. There is no suggestion either in the recorded minutes of the board or in the parol testimony in evidence, of an intention to forever dedicate to dormitory purposes a portion of the University campus, thereby withdrawing from the regents and the state the power to use the campus in such manner as to best subserve the interests of the State University as changed conditions may require or be deemed expedient. The parol evidence, to our mind, if deserving of any probative force, tends to strengthen this conclusion. Col. Brackenridge is described by Judge Batts as a careful business man, who was not in the habit "of throwing his money at the birds." His interest in the University is a matter of public history; he was its first and one of its greatest benefactors. He was a regent from 1886 to 1911, and again from 1917 to 1919. His interest in the institution continued up to the date of his death. It is not reasonable to suppose that he would have intended to create the trust or impose the conditions contended for; nor is it reasonable to suppose that the regents, in accepting the gift, had such intention. The evidence thereof must be clear and satisfactory. In the absence of any evidence on the subject further than the original purpose of the donation, it should be presumed rather that if such intention had existed in the minds of the parties it would have had spe-cific expression in some permanent record, and not be left to mere conjecture or surmise.

The fact that Col. Brackenridge in 1920 first consented to abandoning the use of the hall as such, and afterwards withdrew his consent, if it has any bearing at all on the controversy, indicates that it was his construction of the gift that no trust or limitations regarding the use of the property were imposed. The question then in his mind seems clearly to have been, not the power of the regents to abandon B Hall, but the advisability of its abandonment. Mr. Montague quotes him as saying that no conditions were attached to the gift, and his chief concern appears to have been whether the hall had served its purposes. If so, he recognized the authority of the board to abandon it.

The fact that Dr. Vinson consulted Col. Brackenridge in the first instance and later acceded to his wishes has no bearing whatever on the merits of the controversy. What was then done is exactly what one would expect on the part of a beneficiary in dealing with its benefactor in reference to any proposed change in the use of the proceeds of the gift.

[6] But even if the evidence warranted a holding in favor of a trust or conditions, it also clearly shows that the terms of the trust and the conditions imposed have been fully complied with, and the purposes of the gift have been accomplished. Whether the property should be further used as a dormitory or for other purposes is now a matter which addresses itself to the sound discretion of the governing body. When the donation was made the institution was in its infancy, the attendance was small, about 300, means for its support were meager, and the policy of the institution had not progressed far from the formative stage. The gift was timely in that it supplied an urgent need. That it was fully appreciated is evidenced by the board minutes of 1890, and Governor Ross' message. For 36 years the three upper floors of the building have been used as was originally designed. In the meantime the institution has grown in endowment and attendance many fold. About 5,000 students are now in attendance. The campus has been considerably enlarged by purchase of adjacent lands, for which the Legislature appropriated a million and a third dollars. A large building plan is under way to meet the requirements of the institution. The uncontradicted evidence shows that the building is badly in need of repair and that a large sum of money will be required for the purpose, even if its use as a dormitory is continued. The evidence indicates also that in the minds of some of the patrons of B Hall the advisability of retaining it on the campus is at least questionable, and a movement to raise a fund

to erect another building off the campus has been contemplated. All of these considerations and perhaps others which might be mentioned lead irresistibly to the conclusion that the purposes of the donation have been satisfied, and the further use of the building as a dormitory is a matter which addresses itself solely to the sound discretion of the governing board. The following cases support this holding: Railway v. R. R. Com. (Tex. Civ. App.) 275 S. W. 261; Mead v. Ballard, 7 Wall. 290, 19 L. Ed. 190; Railway v. Marshall, 136 U. S. 393, 10 S. Ct. 846, 34 L. Ed. 385; Railway v. Scott, 77 F. 726, 23 C. C. A. 424, 37 L. R. A. 94.

[7, 8] Upon the fifth and sixth holdings, above, we think it only necessary to state that the arrangement between appellees and the B Hall manager only evidence a room reservation, terminable at the will of either party. It was an arrangement made for the convenience of the students in the orderly assignment of rooms, and was clearly contingent on the operation of the building as a dormitory. The students to whom assignments had been made were in no sense lessees of the property and whatever rights they may have acquired by making the nominal deposit and being issued receipt therefor were clearly not such as would support an injunction which would deprive the regents of their inherent powers to discontinue use of the building as a students' dormitory.

The order of the trial court appealed from is set aside, and the temporary injunction is dissolved.

Order appealed from set aside, and temporary injunction dissolved.