**RAINEY et al. v. MALONE.**

No. 9029.

Court of Civil Appeals of Texas. Austin.

May 15, 1940.

Rehearing Denied June 12, 1940.

Gerald C. Mann, Atty. Gen., and George W. Barcus, Robert E. Kepke, Ocie Speer, and James Noel, Asst. Attys. Gen., for appellants.

Robert C. Eckhardt and Creekmore Fath, both of Austin, for appellee.

McCLENDON, Chief Justice.

Malone brought this (a mandamus) suit against the members of the Board of Regents, the President, Auditor and Registrar of the University of Texas, to compel his admission as a student of the University without paying a $1 "compulsory student fee" (popularly called "Student Union Fee"), levied by the Board of Regents under authority conferred by Subsection 19, § 2, of the 1939 general appropriation bill for the support of the several State institutions of higher learning. Vol. 2, Chap. 8, p. 310, H.B. 255, Special Laws Reg.Sess. 46th Leg., 1939. Malone had previously been denied the right to file an original mandamus proceeding in the Supreme Court upon the ground that the respondents were not "officers of the executive departments of the government of this State," within the meaning of R.C.S. Art. 1735. Malone v. Rainey, Tex.Sup., 133 S. W.2d 951. Respondents filed in the instant suit a plea in abatement, upon the ground that relator had an adequate remedy at law provided by Vernon's Ann.Civ. St. art. 7057b, under which, in order to test validity of the fee he was required to pay it under protest, and bring suit for its recovery. The plea was overruled, and in a trial to the court without a jury the judgment was for the relator awarding the mandamus as prayed. The respondents have appealed.

Since we are holding that the trial court improperly overruled the plea in abatement, we will confine our discussion to that issue, pretermitting the several grounds upon which the relator contends that the "Student Union Fee" is an illegal exaction, and the respondents contend that the fee was authorized and valid.

As to the pleading and proof it is only necessary to say that they were sufficient to sustain relator's right to be admitted as a student of the University in every respect except as to the payment of the "Student Union Fee." The pertinent portion of Art. 7057b reads: "Sec. 1. Any person, firm or corporation who may be required to pay to the head of any department of the State Government any occupation, gross receipt, franchise, license or other privilege tax or fee, and who believes or contends that the same is unlawful and that such public official is not lawfully entitled to demand or collect the same shall, nevertheless, be required to pay such amount as such public official charged with the collection thereof may deem to be due the State, and shall be entitled to accompany such payment with a written protest, setting out fully and in detail each and every ground or reason why it is contended that such demand is unlawful or unauthorized."

This article was expressly held to be valid and to afford adequate legal remedy in Rogers v. Daniel O. R. Co., 130 Tex. 386, 110 S.W.2d 891. However, it was held that the remedy was not adequate in those cases where its employment required a multiplicity of suits; in which event the equitable remedy of injunction might be resorted to. This defect in the original Art. 7057b was cured by amendment in 1939 (S.B. 400, Chap. 11, p. 643, Gen.Laws 46th Leg., Vernon's Ann.Civ.St. art. 7057b, §§ 2, 2a, 2b).

The respective contentions of the parties upon the merits of the plea in abatement present two questions of statutory construction:

1. Is the Board of Regents of the University of Texas "the head of any department of the State Government," within the meaning of Art. 7057b, Sec. 1?

2. Is the "Student Union Fee" a "tax or fee" within the meaning of said section?

It must be conceded at the outset that these questions present no little difficulty, especially in view of the holding in Betts v. Johnson, 96 Tex. 360, 73 S.W. 4, on the one hand, and that in Herring v. Houston Nat. Exch. Bank, 113 Tex. 264, 253 S.W. 813, 814, on the other. In the former the Supreme Court had for determination whether the "Board of Eclectic Medical Examiners" constituted an "officer of the state government," within the meaning of Art. 946, R.C.S.1895, which conferred original jurisdiction upon the Supreme Court. or any justice thereof, "in term time or

vacation" to "issue writs of quo warranto or mandamus against any district judge or officer of the state government, except the governor of the state." The holding was that "officer of the state government" was used in the sense of "head of a department of the State government" and as such it included only those executive officers who are "intrusted with the general administration of state affairs and who exercise general governmental functions."

The course of reasoning by which this conclusion was reached is contained in the following quotation: "We fail to see any very good and sufficient reason why the Legislature should have deemed it appropriate to confer original jurisdiction upon this court to grant a writ of mandamus against executive officers, other than those intrusted with the general administration of state affairs and who exercise general governmental functions. Others are officers in a certain sense, but in another sense, they are mere agents charged with the performance of special functions. The district courts have jurisdiction to issue the writ of mandamus to all other officers except heads of departments, and, as in other cases, appeals are allowable for the correction of the errors of those tribunals. Therefore we think the Legislature might have well considered that it was neither necessary nor proper to give the Supreme Court jurisdiction to issue the writ of mandamus against such officers."

In the Herring case the court had for determination whether the Board of Prison Commissioners constituted the "head of any department of the state of Texas," within the meaning of Art. 2105 (present Art. 2276), the pertinent portion of which reads: "Neither the State of Texas, nor any county in the State of Texas, nor the Railroad Commission of Texas, nor the head of any department of the State of Texas, prosecuting or defending in any action in their official capacity, shall be required to give bond on any appeal or writ of error taken by it, or either of them, in any civil case."

The holding was that "head of any department of the state" was used in its popular sense and was not limited to the executive officers and departments of the government. So construed, it applied to all "governmental agencies, while 'prosecuting and defending in any action in their official capacity.' * * *

"It could hardly have been in the mind of the Legislature, in enacting this general statute exempting governmental agencies, while 'prosecuting and defending in any action in their official capacity,' from giving bond on appeal in civil cases, to limit its application to the departments named in section 1, article 4, of the Constitution as constituting the executive department of the state."

The fact that the Railroad Commission was expressly mentioned in the article afforded no impediment to the conclusion that "departments of the State Government" was intended to include all governmental agencies.

"It is a matter of common knowledge that the state, through its Legislature, has zealously guarded the Railroad Commission. It is thought that in its zealous care for the Railroad Commission, and the knowledge that much litigation would arise concerning it and growing out of the administration of its functions, it was inserted in this article, without intending to limit its general application to the executive departments of the state of Texas enumerated in section 1, article 4, of the Constitution [Vernon's Ann.St.]."

In the Betts case, on the other hand, significance was attached to the fact that "officer" and not "officer or board of officers," was used in the 1895, Art. 946.

We have then for construction an expression ("head of any department of the State Government") of varied and therefore of equivocal meaning—an expression construed, on the one hand, to have been employed in a narrow, restricted sense, and on the other, to have been used in its general popular sense—as such respective constructions were deduced from the context and the legislative objective in enacting the legislation in which the expression was used. In other words, the controlling element in each of these diametrically opposed lines of decision was the effectuation of the legislative objective, as that objective was interpreted to inhere in the several legislative enactments under consideration.

As illustrative of the equivocal meaning of "department of government": If one were asked the abstract question, what are the departments of government, the probable, and no doubt appropriate, answer would be, the three departments mentioned in the Constitution—the legis-

lative, the executive and the judicial. Manifestly the term was not so employed in any of the statutes under consideration.

We have here for construction a statute the general objective of which is to facilitate the collection of the revenues of the State; and to prevent impeding such collection by injunction or other suits brought against officials of the State charged with the duty of such collection. It may be conceded that the primary occasion which brought about the legislation was the ever growing frequency of suits brought to enjoin collection of various excise taxes from time to time imposed. But the language of the statute (as in Art. 2276) is broad enough to include any agency ("head of any department") of the State Government to whom anyone might "be required to pay" any privilege tax or fee falling within the meaning of the act. Many State governmental agencies have been created within recent years charged with the duty of collecting fees for privileges conferred or to defray the administration expenses of such agencies. No impelling reason suggests why impediment to the collection of such fees should not be removed; nor why such officials should not be relieved of harassment by injunction or other suits in like manner as provided in the case of excise taxes. The specific enumeration of such taxes may readily be explained, without limitation of the general scope of the statute, just as was specific enumeration of the Railroad Commission in Art. 2276. We therefore conclude that Art. 7057b applies to any "privilege tax or fee" required to be paid to any agency ("head of department") of the State Government.

The Regents of the University are clearly officers of the State charged with a most important governmental function. This was expressly held in Splawn v. Woodard, Tex.Civ.App., 287 S.W. 677. That the Board is the "head of a department of the State Government" within the meaning of Art. 2276 admits of no substantial doubt under the holding in the Herring case. Respondents are appellants in this court without having filed an appeal bond, and their right to do so is not challenged; as was also the case in Splawn v. Woodard.

The importance of public education, not only as an appropriate, but as an essential governmental function, has always been recognized in Texas. Every school boy and girl is early taught to know that one of the grievances in the Texas declaration of independence against the then Mexican government was its "failure to establish any public system of education." The messages of the presidents of the Republic are replete with expressions emphasizing this importance, and the promotion of public education has been a professed chief objective of every succeeding state administration. As early as 1838 the Congress of the Republic began to lay the foundations for a State educational system by the grant of portions of the public domain for that purpose, and the following year (January 26, 1839) an act was approved requiring the President "to appoint a surveyor and have surveyed on and from any of the vacant lands of the Republic, fifty leagues of land, which is to be set apart and is hereby appropriated for the establishment and endowment of two colleges or universities, hereafter to be created."

When at long last the University was actually established, the establishing act provided: "The fee of admission to the University shall never exceed thirty dollars. It shall be open to all persons of both sexes in this State on equal terms, without charge of tuition, under the regulations prescribed by the regents, and to all others under such regulations as the board of regents may prescribe."

The provision for free tuition was in accordance with a policy expressed in previous enactments, beginning in 1858, providing that "Instruction at the University shall be free." Chap. 116, Gen.Laws 7th Leg., p. 148; 4 Gammel's Laws, p. 1020. The admission fee of $30 was paid by each student only once upon his first admission to the University, regardless of the length of time of his attendance. There was no change regarding student fees until enactment of what is popularly known as the Pollard Fee Bill in 1927 (Art. 2654a, Vernon's Ann.Civ.St.). That bill applied generally to all "State educational institutions." Section 1 retained the inhibition against any "tuition fee." Section 2 authorized a "matriculation fee" of not exceeding $30 for any term of nine months. We are not concerned here with the other provisions of the act. In 1933 the legislature passed an act (Vernon's Ann.Civ.St., Art. 2654c) applying to the several institutions of collegiate rank, requiring collection of "tuition" as follows: "1. From each resident student, who registers for

twelve (12) or more semester hours of work per semester of four and one-half (4½) months, Twenty-five Dollars ($25.-00) per semester; or, who registers for twelve (12) or more term hours of work per term of three (3) months, Sixteen Dollars and Sixty-seven Cents ($16.67) per term." Section 1.

This act also provided: "5. The foregoing provisions, requiring the governing boards to collect tuition, shall not be interpreted as depriving the said boards of the right to collect such library, laboratory, and other fees as they are now permitted by law to collect." Section 1.

The above fees have been uniformly appropriated biennially to the support of the University or other designated institution.

The only subsequent legislation upon the subject of student fees is Subsection 19 of the 1939 appropriation, authorizing the "student union fee," which we quote in full:

"Subsection (19) The Board of Regents of The University of Texas is hereby authorized to levy a compulsory student fee not to exceed One Dollar ($1) per student for each semester of the Long Session and not to exceed Fifty Cents (50c) per student for each term of the Summer Session, or any fractional part thereof as may in their discretion be just and necessary, for the sole purpose of operating, maintaining and improving the Texas Union; provided, however, that the amount of this fee may be changed at any time by the Board of Regents within the limits hereinbefore fixed in order that sufficient funds to support the Union may be raised and yet insuring that no surplus, other than the customary reserves, shall ever be accumulated.

"The Auditor of The University of Texas is hereby directed to collect the fees provided for above and shall credit the money received from the said fees to an account to be known as the Student Union Fee Account; provided, however, that said money shall be used exclusively for the purpose of operating, maintaining and improving the Texas Union and shall be placed under the control and subject to the order of the Board of Directors of the Texas Union.

"The Board of Directors of the Texas Union shall annually submit a complete and itemized budget to the Board of Regents of The University of Texas, said budget to be accompanied by a full and complete report of all activities conducted during the past year and all expenditures made incident thereto.. The Board of Regents shall make such changes in the budget as it deems necessary before approving same, and shall then levy the student fees under the provisions of this Section in such amounts as will be sufficient to meet the budgetary needs of the Union, within the statutory limits herein fixed."

While the above statutes with reference to student fees present several interesting and even difficult questions of statutory construction, which may have bearing upon the merits of the case; they do not involve the merits of the plea in abatement and, as already stated, their discussion is pretermitted. We will state, however, that we have had no difficulty in arriving at the conclusion that the legislature has the power (when properly exercised) to authorize the "Student Union Fee." The Student Union is a commodious building erected on the University campus, the funds being provided partly by private subscription and partly by the University. It provides facilities for the conduct of various extra-curricular activities of social, recreational, and educational natures; all of which are conducted or supervised under the direction of the Board of Regents in accordance with the above Subsection 19. That these activities for the support of which the "Student Union Fee" was authorized and assessed fall appropriately within the functions of a present day university does not, we believe, admit of serious question.

From the above discussion we think it follows that the "Student Union Fee" constitutes a fee within the meaning of Art. 7057b. Certainly it is a fee. Equally certainly it is a "privilege fee." It is exacted as a prerequisite to enjoyment of a privilege—that of obtaining the advantages afforded by the University—in connection with the State's performance of one of its most important governmental functions. It is required to be paid to the governing board of the University, whose members are public officers of the State, and (collectively as a board) constitute a department of the State government within the general meaning of that term. The fee constitutes the revenue for the support of one of the appropriate functions of the University; and every considera-

tion prompting the enactment of Art. 7057b impels its application to the case at bar. There is as cogent reason for preventing impeding the collection of fees properly assessed as prerequisites to entrance into the University as for preventing impeding collection of other fees or taxes; nor is there more urgent need for exempting other state officials or "heads of departments" from harassment by injunction and other suits than for so exempting the University Regents. We believe the inclusion of the "Student Union Fee" within the purview of Art. 7057b is as well supported by reason and authority as are the decisions in the Betts and Herring cases; and we so hold.

The trial court's judgment is reversed and judgment is here rendered abating appellee's suit, without prejudice, however, to whatever rights he may now have to proceed under the provisions of Art. 7057b.

Reversed and rendered.