

## Office of the Attorney General
### State of Texas

**DAN MORALES**
ATTORNEY GENERAL

March 9, 1995

Ms. Catherine A. Ghiglieri
Commissioner
Texas Department of Banking
2601 North Lamar Boulevard
Austin, Texas 78705-4294

Opinion No. DM-329

Re:   Whether state and private university debit card programs are subject to the Sale of Checks Act, V.T.C.S. art. 489d, and related questions   (RQ-684)

Dear Commissioner Ghiglieri:

On behalf of the Texas Department of Banking (the "department"), you ask about state and private university "debit card" programs. You generally describe such programs as follows: "[A] university accepts money from students (and sometimes from faculty and staff) and, in turn, issues a card to each . . . to be used for drawing against this account to obtain goods and services on campus." You state that the department is aware of at least three state universities that have established a debit card program: Texas A&M University, Stephen F. Austin State University, and Texas Tech University. You also inform us that Southern Methodist University, a private university, has such a program. In addition, we have received a brief from the University of Texas stating that it has several debit card programs.

Essentially, you ask three questions. First, you ask whether the issuance of debit cards amounts to the sale of checks under the Sale of Checks Act, V.T.C.S. art. 489d. Second, you ask whether an entity which issues debit cards acts as a bank and is required to obtain a bank charter. Third, you ask whether the foregoing entities are statutorily authorized to issue debit cards to students, faculty and staff. We have received briefs from all of the above universities arguing that their respective debit card programs do not amount to the sale of checks or unauthorized banking and that the institutions are authorized to issue such cards.

It is apparent from the briefs we have received that the universities' debit card programs vary. As we read your request, we understand that you are only interested in those debit card programs with the following features: A student, faculty member or staff person deposits a certain amount in an account with the university, and receives a card (or perhaps encoded information on a preexisting identification card) that identifies the

account. The cardholder presents the card when making a purchase from a university vendor or, in some cases, third-party vendors operating concessions on campus pursuant to a contract with the university. When a purchase is made, the cashier uses the card to identify the account and determine whether the account balance is sufficient. After the purchase is made, the amount of the purchase is automatically deducted from the account. Because the purchase may not be made with the card if the account balance is insufficient, it is impossible to overdraw the account. We limit our discussion to the foregoing type of debit card program. We do not address "vend stripe" cards[1] or cards involving accounts with third parties.

The Sale of Checks Act prohibits any "person" from engaging "in the business of selling checks, as a service or for a fee or other consideration, without having first obtained a license hereunder." V.T.C.S. art. 489d, § 3. The term "person" is defined in section 2(a) of the act to mean "any individual, partnership, association, joint stock association, trust, or corporation, but does not include the United States Government or the government of this state." Id. § 2(a). The term "sell" means "to sell, to issue, or to deliver a check." Id. § 2(e). The term "check" means "any check, draft, money order, personal money order, or other instrument for the transmission or payment of money." Id. § 2(c).

We are unaware of any judicial opinions construing the act. We believe that it is unlikely that a court would conclude, however, that a debit card program like the one you describe runs afoul of the act. First, the act's prohibitions apply solely to "persons" as defined in section 2(a) of the act. See id. §§ 3, 16. The state universities do not appear even to fall within this definition. A state university is not an individual, partnership, association, joint stock association, trust or corporation as required by section 2(a).[2]

---

[1]A person pays for a "vend stripe" card with a specific value. The card contains a magnetic (or "vend") stripe which is encoded with its value. Every time a purchase is made, the amount of the purchase is deducted from the card's value until the value of the card is exhausted.

We disagree with the contention of the University of Texas that vend stripe cards are indistinguishable from the type of debit card you ask about. A vend stripe card is like cash in that its value is inherent and no refund is available if it is lost or stolen. No money is held on deposit with the university.

[2]A brief submitted by your office contends that the state universities are "persons" under the act because they have been empowered by the legislature to engage in certain nongovernmental functions. Although state universities may be authorized to engage in nongovernmental functions, we fail to see how it follows that the legislature has endowed them with partnership, association, joint stock association, trust, or corporation status.

Moreover, we believe that a court would conclude that a state university is part of "the government of this state" and therefore excluded from the meaning of the term "person" under the plain language of section 2(a). *See Rainey v. Malone*, 141 S.W.2d 713, 716 (Tex. Civ. App.--Austin 1940, no writ) (holding that the board of regents of the University of Texas is the "head of a department of the State government" within the meaning of former article 2276, V.T.C.S.); *Allis-Chalmers Mfg. Co. v. Curtis Elec. Co.*, 259 S.W.2d 918, 921 (Tex. Civ. App.--Austin 1953) (holding that the words "this State" as used in now-repealed article 5160, V.T.C.S., were intended to include Texas A&M and its governing board), *rev'd in part on other grounds*, 264 S.W.2d 700 (Tex. 1954).[3] Accordingly, we believe that it is likely that a court would conclude that the state universities are simply not subject to the act. Of course, the same would not be true in the case of a private university.

We also believe that it is likely that a court would conclude that the kind of debit card program at issue does not constitute the sale of checks. In defining the term "check" to mean "any check, draft, money order, personal money order, or other instrument for the transmission or payment of money," *see id.* § 2(c), the act appears to contemplate that a check is a written instrument. Checks, drafts, money orders, and personal money orders are written instruments, and the term "instrument" itself is commonly understood to refer to a written document. *See* BLACK'S LAW DICTIONARY 719-20 (5th ed. 1979) (defining the term "instrument" as "[a] written document" and "[a]nything reduced to writing"). The debit card program you describe does not involve the sale of a written instrument.

Furthermore, although the act does not define the term "check", we believe that the legislature intended the term "check" to refer to negotiable instruments, as the term is defined in the Uniform Commercial Code ("UCC") and section 3.104(b)(2) of the Texas Business and Commerce Code. We base this conclusion on section 12 of the act which provides:

> Each licensee shall be liable for the payment of all checks which he sells, in whatever form and whether directly or through an agent, as the maker or drawer thereof according to the negotiable instrument laws of this state; and a licensee who sells a check, whether directly or through an agent, upon which he is not designated as maker or drawer shall nevertheless have the same

---

[3]Courts have consistently held that public senior colleges and universities, such as the state universities at issue here, *see infra* note 6, are part of the state for purposes of constitutional immunity. *See Idoux v. Lamar Univ. Sys.*, 817 F. Supp. 637, 640 (S.D. Tex. 1993) (citing cases).

> liabilities with respect thereto as if he had signed the same as the drawer thereof.

Section 12, in referring so explicitly to the law of negotiable instruments, is strong evidence that the legislature intended the term "check" as defined by the act to be limited to negotiable instruments. *See* Bus. & Com. Code § 3.104(a) (defining the term "negotiable instrument" for purposes of Texas Uniform Commercial Code). The debit card program you describe does not involve the sale of negotiable instruments.

You also suggest that universities which issue debit cards are engaged in the unauthorized business of banking. We are not aware of a Texas statute which defines the term "bank" or "banking." You suggest that accepting deposits is the primary indicia of a bank. It is clear from Texas case law, however, that no one feature defines a bank.

> Historically a bank merely served as a place for the safekeeping of the depositors' money and even now that is the primary function of a bank. 9 C.J.S., Banks and Banking, § 3, page 31. The term "bank" now by reason of the development and expansion of the banking business does not lend itself to an exact definition. 7 Am. Jur., Banks, § 2.

*Brenham Prod. Credit Ass'n v. Zeiss*, 264 S.W.2d 95, 97 (Tex. 1953); *see also Commercial Nat'l Bank v. First Nat'l Bank*, 80 S.W. 601, 603 (Tex. 1904) (discussing activities of banks under federal law); V.T.C.S. art. 342-302 (listing powers of a state bank). Furthermore, authority from other jurisdictions suggests that an entity is not necessarily a bank just because it engages in certain acts that are typical of banks; rather one must look at the activities of the entity as a whole. *See, e.g.,* 9 C.J.S. *Banks and Banking* § 1, at 30 (1938) ("Banking is the business of receiving deposits payable on demand, discounting commercial paper, making loans on collateral security, issuing notes payable on demand . . . , collecting notes or drafts, buying and selling bills of exchange, negotiating loans, and dealing in negotiable securities. Exercise of all these functions is not necessary, nor does exercise of certain of them necessarily render a corporation a bank."); 10 Am. Jur. 2d *Banks* § 3, at 27 (1963) ("Carrying on a banking business does not mean the performance of a single disconnected banking business act[;] [i]t means conducting, prosecuting, and continuing business by performing progressively acts normally incident to the banking business"); *see also Brenham Prod. Credit Ass'n*, 264 S.W. 2d at 97 ("While . . . the lending of money is one of the principal functions of a bank, nevertheless there are many agencies authorized by both state and federal governments to lend money, which are not banks nor considered as such"). We do not believe that a court would conclude that a university that offers a debit card program such as the one you describe among its many and various activities engages in banking.

You have submitted to this office an opinion issued by the Comptroller of Florida regarding whether the card program of a public university in that state constituted a banking activity. The cards in that program could be used to pay for goods and services and to make cash withdrawals from automated teller machines ("ATMs") on and off campus operated by a private bank. Relying in part on a federal appeals court decision holding that the payment of a cash withdrawal from an ATM constitutes payment of a check, *Illinois ex rel. Lignoul v. Continental Illinois Nat'l Bank & Trust Co.*, 536 F.2d 176 (7th Cir.), *cert. denied*, 429 U.S. 871 (1976), the Comptroller of Florida concluded that the university paid checks by allowing cash withdrawals with its card at ATMs operated by a private bank.

We do not believe that this opinion supports your position that the kind of debit card program at issue here involves a sale of checks under the act or unauthorized banking. First, *Illinois ex rel. Lignoul* dealt with whether a cash withdrawal from an ATM constituted "branch banking" within the meaning of the National Bank Act, 12 U.S.C. § 36(f). We do not read that case to hold that an ATM withdrawal, or the use of any other card, necessarily constitutes payment of a check for purposes of section 3-104(3) of the Uniform Commercial Code. Indeed, the primary case upon which *Illinois ex rel. Lignoul* relies clearly points out the difference between the Uniform Commercial Code's narrow definition of a check and the expansive definition of a branch bank in section 36(f) of the National Bank Act. *See Independent Bankers Ass'n of America v. Smith*, 534 F.2d 921, 942 (D.C. Cir. 1976).[4] Thus, although a cash withdrawal from an ATM may constitute payment of a check for purposes of the National Bank Act, it does not necessarily constitute a check for purposes of the Uniform Commercial Code or the common commercial understanding of the term. Therefore, the Florida comptroller's opinion does not convince us that the debit card programs at issue here involve the sale of

---

[4]*Independent Bankers Ass'n of America v. Smith*, 534 F.2d 921 (D.C. Cir. 1976), states in pertinent part:

> To determine what constitutes paying a "check" under section 36(f) this court must balance the technical commercial definition of a "check" against the method of statutory interpretation prescribed by the Supreme Court .... The [UCC] defines a "check" as a "negotiable instrument" (i.e., a "draft") "drawn on a bank and payable on demand." Admittedly, it would be difficult to fit under the UCC definition, or the standard dictionary definition, of "check" anything involved in an unmanned [ATM] withdrawal transaction. Fortunately, such semantical exercises have become unnecessary since the [Supreme] Court instructed that the "definition of 'branch' in section 36(f), must not be given a restrictive meaning which (would) frustrate the congressional intent."

*Id.* at 942 (footnote omitted).

"checks" as that term is defined by the act. We also believe that the Florida opinion is inapposite with respect to the question whether Texas universities that offer debit card programs engage in banking. The type of debit card program you ask about does not permit cardholders to make cash withdrawals from their accounts much less allow them to make cash withdrawals from ATMs operated by a private bank.

This brings us to your final question, that is, whether a debit card program such as the one you describe exceeds the statutory authority of a state or private university. Private universities, such as Southern Methodist University, are generally organized as nonprofit corporations. Their powers are set forth in their corporate charters and the Texas Non-Profit Corporation Act, V.T.C.S. arts. 1396-1.01 - 11.01. The Texas Non-Profit Corporation Act defines the powers of nonprofit corporations expansively: "each corporation shall have power . . . [w]hether included in the foregoing or not, to have and exercise all powers necessary or appropriate to effect any or all of the purposes for which the corporation is organized." V.T.C.S. art. 1396-2.02(15). For this reason, we believe that private universities are authorized to operate debit card programs, provided that the programs are consistent with the educational mission set forth in their corporate charters[5] and do not violate the Sale of Checks Act or constitute unauthorized banking.

The state universities contend that their debit card programs are authorized by section 51.002 of the Education Code which provides that the governing board of certain institutions of higher education, including the state universities at issue here,[6] "may retain control of [certain] sums of money collected at the institution, subject to Section 51.008 of this code." Educ. Code § 51.002. Included in that list are "students' voluntary deposits of money for safekeeping." *Id.* § 51.002(a)(8). Section 51.002, in essence, authorizes the institutions to hold such student monies locally rather than depositing them in the state treasury. We do not believe that this provision expressly authorizes debit card programs. At most, this language acknowledges the practice at many universities of holding student money for safekeeping. Furthermore, as you point out, this provision

---

[5]We have not been provided with a copy of Southern Methodist University's corporate charter and do not comment on it.

[6]Section 51.002 applies to each institution of higher education, as that term is defined by section 61.003 of the Education Code. *See* Educ. Code § 51.001. The University of Texas, Texas A&M University, Texas Tech University, and Stephen F. Austin State University are included within the meaning of this term. Under section 61.003, "institution of higher education" means "any public technical institute, public junior college, public senior college or university, medical or dental unit, or other agency of higher education as defined in this section." *Id.* § 61.003(8). The term "public senior college or university" includes the University of Texas campuses, Texas A&M University, Texas Tech University, and Stephen F. Austin State University. *Id.* § 61.003(3), (4).

does not authorize public universities to retain the deposits of faculty and staff. For these reasons, we do not believe that section 51.002(a)(8) alone is a sufficient legal basis for the debit card programs you describe.

The University of Texas argues that its debit card programs are authorized by section 65.31 of the Education Code, which generally authorizes the board of regents to "govern, operate, support, and maintain" the University of Texas System, and its general power to offer benefits to its employees. There are similar provisions establishing the authority of the board of regents of Texas A&M University, *see id.* § 85.21, Stephen F. Austin State University, *see id.* §§ 101.11, .41, and Texas Tech University, *see id.* § 109.21. Although these provisions do not expressly authorize the state universities to operate debit card programs, it is possible that a court would conclude that such authority *may be implied from the board of regents' general authority to govern the universities.*

In past opinions, this office has concluded that state universities have broad authority to provide services and perform functions not expressly authorized by statute. *See, e.g.*, Attorney General Opinions H-513 (1975) (food cooperative may be operated as student service or auxiliary enterprise of North Texas State University); WW-5 (1957) (Texas Tech authorized to operate educational television channel); Letter Advisory No. 6 (1973) (university may validly determine that public interest research activities constitute student services). In this case, provisions which broadly authorize state universities to provide student services, *see* Educ. Code § 54.503(b) (authorizing the governing board of an institution of higher education to charge and collect fees to cover cost of broad range of student services),[7] and which recognize the authority of state universities to establish auxiliary enterprises, activities that are not strictly educational but that support the educational mission of the university, *see* Tex. Const. art. VII, § 17(f); Educ. Code § 61.003(14), may provide similar implied authority for debit card programs. In sum, although we have found no statute which expressly authorizes a state university to operate a debit card program, we believe that it is likely that a court would probably construe the broad powers of a board of regents to impliedly authorize a state university do to so.

---

[7]Subsection (a) of section 54.503 defines the term student services to include "any other student activities and services specifically authorized and approved by the governing board of the institution of higher education."

## S U M M A R Y

It is unlikely that a court would conclude that a university debit card program which does not involve the transfer of funds via written instruments is subject to the Sale of Checks Act, V.T.C.S. art. 489d. It is also unlikely that a court would conclude that a university that offers a debit card program among its many and various activities engages in banking.

Private universities are authorized to operate debit card programs, provided that the programs are consistent with the educational mission set forth in their corporate charters and do not violate the Sale of Checks Act or constitute unauthorized banking. Although we have found no statute which expressly authorizes a state university to operate a debit card program, we believe that it is likely that a court would probably construe the broad powers of a board of regents to impliedly authorize a state university do to so.

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Mary R. Crouter
Assistant Attorney General