JAMES, State Treasurer, et al. v. CONSOLIDATED STEEL CORPORATION, LIMITED.

No. 9558.

Court of Civil Appeals of Texas. Austin.

June 19, 1946.

Rehearing Denied July 10, 1946.

Grover Sellers, Atty. Gen., and Robert O. Koch and L. P. Lollar, Asst. Attys. Gen., and Clyde Messer and W. H. Farmer, both of Austin, for appellants.

Strong & Moore, of Beaumont, and Black, Graves & Stayton, and John W. Stayton, all of Austin, for appellee.

BAUGH, Justice.

Suit is by the Consolidated Steel Corporation, Ltd., a California corporation, having a permit to do business in Texas, against the State Treasurer, the Attorney General, the Texas Unemployment Compensation Commission, and the individual members thereof. For convenience and brevity the appellants will be referred to as the Commission; and the plaintiff, appellee here, as the corporation. The suit was brought under the provisions of Art. 7057b, Vernon's Ann.Civ.St., to recover, as excess payments, unemployment compensation or "contributions", paid quarterly to the Commission by the corporation under protest, during the year 1944, aggregating the sum of $823,324.99, together with interest thereon from the respective dates of payment. By trial amendment the corporation tendered into court the amount of such taxes or "contributions" which it asserts it should have paid, but did not, during the year 1940. Trial was to a jury but at the close of the evidence the trial court withdrew the case from the jury on the ground that no issue of fact was presented; rendered judgment in favor of the corporation for the amount sued for; and in favor of the Commission against the corporation for $1,995.-22 as the amount of taxes, interest and penalty which the corporation owed for the year 1940. Appeal is by the Commission from that judgment.

The first contention made is that the trial court was without jurisdiction to determine the cause for the reason that the corporation had an administrative remedy before the Commission, provided for in the Act, which it was required to resort to and exhaust before bringing such suit; and that it had not done so. The Act involved is published in Vernon's Ann.Civ.St. as Act 5221b—1 et seq., and subsections thereunder, and for convenience the arrangement of sections by Vernons will be cited, unless otherwise stated, instead of the sections as numbered in the original and amended acts of the legislature. This first contention is predicated upon Vernon's Ann.Civ.St. Art. 5221b—12(j), which reads as follows: "Where any employing unit has made a payment to the Commission of contributions alleged to be due, and it is later determined that such contributions were not due, in whole or in part, the employing unit making such payment may make application to the Commission for an adjustment thereof in connection with contribution payments when due, or for a refund thereof because such adjustment cannot be made, and if the Commission shall determine that such contributions or penalty, or any portion thereof were erroneously collected, the Commission shall allow such employing unit to make an adjustment thereof without interest in connection with contribution payments then due by such employing unit, or, if such adjustment cannot be made, the Commission shall refund said amount without interest from the Fund, provided that no application for adjustment or refund shall ever be considered by the Commission unless the same shall have been filed within four (4) years from the date on which such contributions or penalties would have become due, had such contributions been legally collectible by the Commission from such employing unit. For like cause, and within the same period, adjustment or refund may be so made on the Commission's own initiative."

There is a rule of practically universal application that where the law provides a method whereby an aggrieved party may, in tax matters, have his rights determined in a hearing before an administrative agency, he must exhaust his remedy there before appealing to the courts. And this rule applies to Unemployment Compen-

sation laws. 40 Tex.Jur., § 137, p. 192; 51 Am.Jur., § 769, p. 698; Abelleira v. District Court of Appeal, 17 Cal.2d 280, 109 P.2d 942, 132 A.L.R. 715. An exhaustive discussion of this rule, with review of numerous cases is found in the Abelleira case. It is a matter subject to legislative control, and when the legislature has provided a method of review, it may make it mandatory, in which case resort must first be had to the method prescribed before the courts will entertain jurisdiction. 51 Am.Jur. § 768, p. 697. But such rule does not bar a resort to the courts, if such administrative agency or commission refuses to act, acts illegally or arbitrarily, or beyond the scope of its authority.

█ The Texas Act prescribes in detail the steps to be taken by a claimant for compensation, the method of hearing, sets up appeal tribunals, prescribes procedure thereof, and the conditions on which an aggrieved party may secure a judicial review of his claim (Art. 5221b—4). Sub. (h) of that Article expressly forbids judicial review of such claim for compensation unless and until the claimant "has exhausted his remedies before the Commission as provided by this Act." And it may be noted also that most of the compensation cases following the rule relied upon by appellants involved claims for compensation, not taxes, wherein the state laws contained a similar provision. But the above quoted language of Sub. (j) of Art. 5221b—12 is the only provision we find in said Act relating to any claim which an employing unit might have for recovery of contributions. The method therein prescribed is permissive and not mandatory, and prescribes no procedure for hearing, appeal, or resort to the courts by the aggrieved party who may be dissatisfied with the decision of the Commission. The absence of such provisions is, we think, significant. We are also in accord with the contention of the appellee that this provision of the statute relates to errors made either by the contributor or by the Commission in the calculation or collection of such taxes which have been paid voluntarily; and was not intended to apply to cases where, as here, the contributor or taxpayer contends before payment

that the tax exacted is illegal and unauthorized. The determination of that question does not involve merely a matter of computation, correction of errors, and adjustment of the amount; but involves distinctly a judicial question.

█ While it does not appear that the corporation applied to the Commission for a hearing on its protest that the tax collected was illegal; it did in its protest to the Commission when making payments thereof, apprize the Commission of the grounds on which it asserted this illegality. And the failure and refusal of the Commission to recognize such protest was, we think, tantamount to denial thereof, or refusal to act thereon, which would authorize resort to a proper court for adjudication of the matter.

█ The Commission's next contention is that the funds here involved, because of their nature and the provisions of the Unemployment Compensation Act, do not come within the terms of the protest statute, Vernon's Ann.Civ.St. Art. 7057b, and are not therefore subject to suit for recovery thereunder. It is not necessary to set out here the provisions of the protest statute. The contention is that such funds are not taxes belonging to the State within the meaning of that statute; and that the Unemployment Compensation Act requires that such funds so paid shall be deposited immediately with the Secretary of the Treasury of the United States in the Unemployment Trust Fund under the Federal Social Security Act, 42 U.S.C.A. § 301 et seq., "any provisions of the law in this State relating to the deposit, administration, release, or disbursement of moneys in the possession or custody of this State to the contrary notwithstanding." Appellants rely on the majority opinion of the Texas Supreme Court in Friedman v. American Surety Co. of N. Y., 137 Tex. 149, 151 S.W. 2d 570, 578, wherein it is stated that "the fund is not the property of the State as such, and never goes into the State Treasury." In so far as permanent custody of such fund is concerned, that is true. There are many special funds derived from fees or taxes, set aside by law for special purposes, and can be used for no other purpose

than that directed by law. However, they are none the less taxes deposited in the State Treasury, and within the meaning and import of the protest statute they "belong to the State," in so far as their collection and payment are concerned. The fact that they are levied for, and set aside for, a particular purpose does not change their character, nor the power of the State to exact, enforce collection, and control such funds.

 Though such funds are designated in the Act as "contributions" of employing units; "they are state taxes other than ad valorem taxes"; and the law levying them is a taxing statute. State v. The Praetorians, 143 Tex. 565, 186 S.W.2d 973, 976, 158 A.L.R. 596. See also Lally v. State, Tex.Civ.App., 138 S.W.2d 1111, 1112; State v. Mauritz-Wells Co., 141 Tex. 634, 175 S. W.2d 238; Friedman case, supra. Not only so, but the Commission itself is the creature of state law which prescribes its duties and powers; Art. 5221b—9. These funds are deposited initially upon collection with the State Treasurer. They are withdrawn upon warrants issued by the Comptroller. The Treasurer is expressly made liable on his bond for such funds. All warrants for payment of benefits require his signature. See Vernon's Ann.Civ.St. Art. 5221b—7. All suits for collection of such taxes must be brought in the name of the State by the Attorney General, and the venue of such suits is fixed in Travis County. Lally v. State, Tex.Civ.App., 138 S.W.2d 1112. Thus they have all the indicia of public funds belonging to the State, and though collected and set aside for a particular purpose, they are none the less taxes collected by the State and, in our opinion, subject to the provisions of the protest statute.

 Nor are the provisions above quoted from Art. 5221b—7(b) that "any provisions of the law in this State relating to the deposit, administration, release, or disbursement of moneys in the possession or custody of this State to the contrary notwithstanding" in derogation of the protest statute.

This language must be construed in the light of the matter to which it relates,—that is, the transfer of such funds to the U. S.

Treasury, after they have been collected and paid into the State Treasury, deposited in one of the accounts therein set up by said law, and have been cleared in such accounts. This necessarily contemplates the completion of the collection process. Whereas, under the protest statute, the State Treasurer is required to place such payments in a suspense account to await the outcome of the adjudication provided for in that statute, where such suit is filed as therein provided. Unless and until such judicial determination is made, such payments cannot, in legal contemplation, be deemed to be *taxes collected* and subject to deposit in the appropriate fund as such. Only after such adjudication do they become so or not as the courts determine.

 It is not denied by appellants that in the instant case appellee could have appropriately applied for an injunction against the collection of the payments here involved; and could have had their legality tested in that manner. But the protest statutes were specifically designed to prevent impeding the collection of taxes through injunction proceedings. And to effectuate that legislative objective a liberal construction and application of those statutes has been adopted. Rainey v. Malone, Tex.Civ.App., 141 S.W.2d 713; Blackmon v. Hansen, 140 Tex. 536, 169 S. W.2d 962; Cobb v. Harrington, Tex.Sup., 190 S.W.2d 709. These matters are fully discussed in Rainey v. Malone [141 S.W. 2d 717], a case involving a required payment by students of the University of Texas of a fee for the benefit of the Texas Union. Such fees were required to be collected by the University Auditor; to be deposited in a special account; to be used exclusively for the operation, maintenance and improvement of such Union; and "under the control and subject to the order of the Board of Directors of the Texas Union." In that case this court held that such fees payable in such manner came within the terms of the protest statute; and that the proper manner of testing the legality thereof was under the provisions of Art. 7057b. More numerous and more cogent reasons obtain for applying the protest statute to the taxes involved in the instant **case.**

The Commission also contends that the corporation's protest filed with its payment of contributions was insufficient in that it did not meet the statutory requirements that such protest set out "fully and in detail each and every ground or reason why it is contended that such demand is unlawful or unauthorized." Art. 7057b, Sec. 1. This contention is not sustained. The same protest was filed with each of the three quarterly payments made in 1945. The reasons stated for such protests were 1. That the Commission was in error in calculating contributions at the rate of 2.7% instead of at the minimum rate of one-half of 1% because immediately prior to January 1, 1944, the corporation had had three years of "compensation experience" within the meaning of the Texas Unemployment Compensation Act, which experience entitled it to a rate of one-half of 1%; and 2. That appellee corporation wholly owned and controlled the Consolidated Steel Corporation of Texas, a Texas corporation, which became subject to said Act on January 26, 1940; had been continuously subject to said Act thereafter, paying contributions to said fund for the years 1941, 1942 and 1943; had a "compensation experience" rating under said Act; and that because of such sole ownership and control of the Texas corporation, appellee was entitled under said Act to the experience record of the Texas corporation.

The purpose of such protest statute was twofold: 1. To require the taxpayer to inform the collecting agency the grounds or reasons for such protest with sufficient clarity and detail for the agency to determine from its own records and the information furnished the merits and validity of the protest; and 2. To prevent the taxpayer, after he files suit, from changing to or asserting upon the trial other or different grounds from those stated in his protest. In other words, to prevent him after making his protest from subsequently taking advantage of the collecting agency upon such trial by "changing horses", so to speak, and having adjudicated grounds or reasons which the agency had not theretofore been called upon or had opportunity to determine. The reasons for such a requirement are obvious. The pro-

visions of Sec. 2 of Art. 7057b confining the trial to "The issues * * * arising out of the grounds or reasons set forth in such written protest as originally filed" is one of limitation, and does not enlarge the provisions of Sec. 1, relating to the grounds or reasons for such protest.

The Act here involved (Art. 5221b—5) prescribes in detail the taxes to be paid, the rate of contributions, rates and tables of computation of such tax, provides for an experience rating after three years of "compensation experience"; how such experience rating shall be computed; provides for a rate of 2.7% "unless and until his account has been chargeable with benefits throughout the thirty-six (36) consecutive calendar months immediately preceding the beginning of the calendar year for which rates are determined." If that provision applies to an employer, then it is the duty of the Commission to compute the tax based on such experience rating according to the standard prescribed by the Act. And when appellee informed the Commission that it predicated its protest on the specific provisions of the law, providing the method of computation, and that it was entitled to the benefits thereof, we think it stated in sufficient detail the "ground or reason" for such protest. Even under a strict construction of that statute it was not necessary for the protestant to state all the evidence on which it relied to sustain its contention. It was sufficient to state the grounds. A plaintiff is not required, and generally not permitted, to plead his evidence even in a judicial proceeding.

The other ground of protest was also predicated upon the provisions of the Act, Art. 5221b—17, Sec. (f) (4), which defines as "employer", subject to the tax, "any employing unit which, together with one or more employing units, is owned or controlled (by legally enforceable means or otherwise), directly or indirectly by the same interest, or which owns or controls one or more other employing units (by legally enforceable means or otherwise) * * *." Appellee's statement of the facts which it claimed brought it under these provisions of the statute which made it

liable for taxes under the Act as if the two corporations constituted but a single employing unit, was clearly sufficient, we think, to meet the requirements of the protest statute. Its statement showed that it owned all of the stock of the Texas corporation and gave the names of the officers and directors of each corporation showing identity of personnel controlling both corporations. Flowers v. Texas-Mexican R. Co., Tex.Civ.App., 174 S.W.2d 70.

The next question raised and stressed by the Commission as being the most important issue in this appeal, involves the construction and application to the facts of this case, of what is commonly referred to in the decisions as the affiliate or common ownership or control clause of the Act. Art. 5221b—17. This Article of the statute is captioned "Definitions", and subsection (e) defines, in so far as our inquiry here is concerned an "employing unit" as "any * * * corporation, whether domestic or foreign * * * which has or, subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State." Following this definition, the Act then prescribes the terms and conditions upon which an "employing unit" becomes an "employer" within the terms of, and subject to the tax levied by, the Act.

Subsection (f) (1) defines "employer" as: "Any employing unit which for some portion of a day but not necessarily simultaneously, in each of twenty (20) different weeks, whether or not such weeks are or were consecutive within either the current or the preceding calendar year has or had in employment eight (8) or more individuals (irrespective of whether the same individuals are or were employed in each such day); * * *."

Subsection (f) (4), particularly relied upon by appellants, provides: "Any employing unit which, together with one or more other employing units, is owned or controlled (by legally enforceable means or otherwise), directly or indirectly by the same interest, or which owns or controls one or more other employing units (by legally enforceable means or otherwise), and which, if treated as a single unit with such other employing unit, would be an employer under Paragraph (1) of this subsection; * * *."

It is contended that under the above quoted provisions of the Act, in order to entitle appellee to the benefit of three years compensation experience in computing its tax rate for 1945 (5221b–5(c), "that the affiliated units after being affiliated must have twenty weeks of employment of eight or more individuals in a year before each of such employing units are considered as an employer." Stating from appellee's brief its position "whereas appellee contends, and the trial court held, that if appellee had as much as one individual in employment in Texas during *one* week within the third quarter of 1940, appellee became an employer in the third quarter of 1940 within the meaning of subsection (f) (4)."

The pertinent facts appropriate to our inquiry here are substantially as follows:

The appellee corporation, and its wholly owned and controlled subsidiary, the Consolidated Steel Corporation of Texas, were both engaged in large scale ship construction for the United States Government before and during World War II at Orange, Texas. The Texas corporation was organized and became an employer under the Act in January 1940. The California corporation, appellee here, was organized long prior thereto; owned all of the stock of the Texas corporation since its organization; and all of the officers and directors of the Texas corporation were also officers and directors of the California corporation.

In April 1940 there was pending in Congress a bill to expand the United States Navy 70%. Because of the war in Europe, the then existing danger of the United States becoming involved, and the immediate need for prompt action, the Navy Department, Maritime Commission, and other agencies concerned, in anticipation of the passage of such law, began laying plans and making urgent preparations in advance for such ship construction program. Then in the employ of appellee corporation were A. G. Roach, vice president, and Harry B. Hird, a retired Navy Captain, chief engineer of the ship building

division of appellee in California, and well versed in the construction of war ships. The Texas corporation, subsidiary of appellee, already had a plant for ship building at Orange, Texas. Captain Hird maintained at Washington a close contact with officers of the Navy Department, with many of whom he had served before his retirement. On June 20, 1940, he notified Roach that if the bill passed, appellee might obtain a contract to construct 25 destroyers at Orange, Texas, on plans furnished. Roach on behalf of appellee acted immediately. On June 28, 1940, appellee submitted to the Navy Bureau of Ships a written proposal to build 2100-ton destroyers; and on July 3, 1940, another proposal, based upon suggested revisions made by the Navy Department. On July 12, 1940, Admiral Robinson, United States Navy representative, in response to such proposal, instructed appellee to "go forward with the program" and told Roach "to proceed as though you had a written contract." On August 3, 1940, Roach confirmed by letter to Admiral Robinson his July 12 instructions to build twelve 2100-ton destroyers at Orange, Texas. After July 12, 1940, every official of the Navy Department concerned with the matter, including Secretary of the Navy Knox, continuously urged upon appellee and its officers and employees, the utmost speed in the prosecution of this program. On July 11, 1940, Roach and Hird had a meeting in Washington, D. C., with a Mr. Torbert, who was to be chief engineer of the project, and Mr. Spofford, a naval architect, all employees of appellee, and all of whom thereafter devoted their entire time to the project at Orange, Texas. Such efforts included not only consultations, conferences at Washington, inspections and negotiations for material and equipment at ship building installations at New York, Boston, Philadelphia, Norfolk, and other places, but trips to Orange with preliminary surveys and arrangements for dredging at Orange, office setups, housing for employees, power, sanitation, transportation, and numerous details preliminary to launching a major shipbuilding enterprize in a city then of only some 7,000 population. A written contract between the Navy Department and appellee was not actually signed until November 11, 1940, but it was dated September 9, 1940, the date the President signed the bill providing for such a program. The fact that the program expanded until more than 20,000 employees were engaged at Orange and during the period of time here involved some $500,000,000 was expended by the government for ships of various types there constructed, but emphasizes the great amount of preliminary effort and preparation essential in advance to launching such an enterprize. While much of the time of the above named employees of appellee (and the number of its employees in Texas increased continuously as the preparations progressed) was spent outside of Texas, one or more of them were repeatedly engaged at Orange, and all their efforts were centered on the project there located. Their services were, within the meaning of the Texas Act, localized in Texas, the situs of the enterprize to which they devoted their entire time after July 12, 1940; and those performed by said employees outside of Texas were but incidental to those performed in Texas. The records of appellee showed that the men above named were dropped from appellee's list of employees in California for unemployment compensation purposes during the fourth quarter of 1940. Under the foregoing facts and circumstances, and others not necessary to recite further here, and without quoting the provisions of Art. 5221b—17(g), we are clear in the conclusion that one or more employees of appellee were continuously employed in Texas for more than 20 weeks during 1940, within the meaning of the Texas Act.

Was such parent corporation required to have 8 or more employees in Texas for such 20-week period during 1940, in addition to the experience of its wholly owned and controlled subsidiary, the Texas corporation, which admittedly had more than 8 such employees in Texas since January 1940, and was a subject employer, in order that the two corporations together be considered as a single employer under Subsection (f) (4)? We do not so construe this section of said Act. If that were true, then such affiliation or common ownership and control section would be rendered practically meaningless, for, un-

der such circumstances, each of such corporations, regardless of, and independent of, the affiliate clause, would by the other terms of the Act be a subject employer and each liable for the tax without any such affiliate provision. Such was obviously not the purpose and intent of Subsection (f) (4). Its purpose was to bring under the Act as employers, employing units, which, but for its provisions, would not be liable as employers, and thus prevent their escaping tax liability. The fact, as would be true in the instant case, that such law inures to the benefit of the taxpayer, does not alter the meaning of the statute. As stated in the annotations under McGrew Paint & Asphalt Co. v. Murphy, 387 Ill. 241, 56 N.E.2d 416, 158 A.L.R. 1229, based upon cited cases, "The purpose of the affiliate clause is to prevent circumvention of the law by dividing a business, having the required employment experience to bring it within the act, into smaller units having less than the minimum requirements."

Most, if not all, of the cases we have been able to find were suits by a Commission, or by unemployed claiming benefits under the law, against employing units who denied liability under such acts. The reported cases show that unemployment compensation acts in the various states are substantially uniform, and in some instances identical in language. But the construction of courts of last resort in the various states is not uniform. Some courts construe such acts liberally to effectuate their general objective; while others apply strict construction in favor of the taxpayer who seeks to avoid liability. Ann. in 142 A.L.R. 918 et seq.; 158 A.L.R. 1229 et seq. The Supreme Court of Texas has adopted a strict construction rule. Texas Unemployment Compensation Commission v. Bass, 137 Tex. 1, 151 S.W.2d 567; State v. The Praetorians, 143 Tex. 565, 186 S.W.2d 973, 158 A.L.R. 596. The decisions are also at variance on the meaning of the language "owned or controlled." Some cases emphasize common ownership by the same interests; others emphasize the element of control rather than that of ownership; some hold that the word "or" means "and" as used in the Act; while others hold that neither element is conclusive, but that both should be considered together (see A.L.R. citations, supra). However, we encounter no difficulty in the instant case because here complete ownership and control was indisputably vested in the "same interest". While we have been cited to no case, and have found none, involving the exact question here presented, we think that when the statute applies, as it undoubtedly does here, the language used in Unemployment Compensation Commission v. City Ice & Coal Co., 216 N.C. 6, 3 S.E.2d 290, 291 (approved by this court in Fleming Hospital v. Williams, Tex.Civ.App., 169 S.W.2d 241), that in such case "the fiction of corporate identity is to be ignored in the face of a reality to the contrary and the affiliated enterprises are to be taxed as a single, employing unit," is applicable. And consequently that as soon as the employees of appellee corporation became engaged in its business at Orange, Texas, that corporation together with its subsidiary then engaged at the same place in the same business, must be treated as a single "employer" under the Act. As such it lost its corporate identity in so far as the Unemployment Compensation Act was concerned, and became a subject employer under that Act liable for all its burdens and entitled to all its benefits.

But the Commission contends that appellee cannot claim the benefits of the affiliate provisions of the Act as an employer in Texas during the fourth quarter of 1940, for the further reasons that it did not obtain a permit to do business in Texas until November 12, 1940; and because it could not legally own the stock of the Texas corporation. The latter contention is foreclosed against it in a recent decision of this court in State v. Swift & Co., Tex.Civ.App., 187 S.W.2d 127, writ refused. The statutes themselves recognize the right of a foreign corporation to own the stock of a domestic corporation without the necessity of securing a permit to do business in Texas. Vernon's Ann. Civ.St. Art. 1533a. See also 11 Tex.Jur., § 482, p. 149.

Nor does the applicability of the Texas Unemployment Compensation Act

to appellee, and its liability for taxes thereunder depend upon its having a permit to do business in Texas. We are not here concerned with the right of the corporation under Arts. 1529 and 1536, Vernon's Ann. Civ.St., to bring suits in Texas courts without such permit. Liability for the tax depended not on whether appellee had a permit to do business in Texas at the beginning of the fourth quarter of 1940; but on whether it, together with its subsidiary, the Texas corporation, had eight or more employees engaged in work in Texas during such period. The language of the statute is "any * * * corporation, whether domestic or foreign," which has employees "performing services within this State." And in a recent case by the Supreme Court of the United States, International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 161 A.L.R. 1057, it was held that the International Shoe Company was required to pay the tax under the Washington Unemployment Compensation Act, though it was a foreign corporation, had neither a permit to do business in that state, nor did it maintain an office nor a stock of merchandise there, but did have more than eight salesmen located and engaged in that state.

■ The Commission further contends that appellee did not meet the burden of proof resting upon it to show that its experience rating entitled it to a .5% rate for 1945, in that it did not report any employment by it during the last quarter of 1940; nor show whether employees during that time, then or thereafter became unemployed; and if so, had such unemployed filed claims in 1941 for benefits under the law, what effect that would have had upon appellee's experience rating. That the only proof in that regard was by basing one presumption upon another, which, under well settled rules of evidence will not suffice. See 17 Tex.Jur., § 57 p. 247. Such is a well settled rule; but is not applicable here. Of course, appellee should have reported, as an employer under said Act, its employees during the fourth quarter of 1940. Had it done so, this suit would not have occurred. The Commission would thus have had a record upon which to handle all claims for bene-

fits that might have been made in 1941. But appellee proved the number of employees it had in Texas during 1940; that only two of them left its service; and that if all employees it had during 1940 had become unemployed; all of them had filed claims; all such claims had been allowed by the Commission in the maximum amount; and the entire amount thereof charged back against the experience table of appellee for the period involved; it still would have been entitled to the minimum rate of .5%. Thus having negatived all possible facts which would require a higher rate than the minimum, it showed as a matter of law that the minimum rate was applicable to it.

■ It is also urged by the Commission that the evidence raised issues of fact, determinable by the jury, as to whether appellee had employees, within the meaning of the Act, "performing services [for it] within this State" during the last quarter of 1940; and that that issue should have been submitted to the jury. We do not agree with this contention. It is unnecessary to here set out the several provisions of the law as to what constitutes such employment; but we think that under the facts of this case, as briefly hereinabove stated, which are without substantial dispute, such services were "localized" within this State, within the definition of the Act which makes them so where "the service is performed both within and without such state, but the service performed without such state is incidental to the individual's service within the state * * *." While, as above stated, much of the early services of said employees necessitated trips, inspections, negotiations, and arrangements made outside of Texas, all of such services contributed to but a single objective, the building of ships at Orange, Texas, and had no other purpose. As soon as this ground work was completed, said employees moved to Orange and proceeded with the fulfillment of such plan and the performance of the contract with the Navy. We are clear in the view, therefore, that the services of the named employees, performed outside of Texas before the actual construction of ships at Orange began, or before the contract with

the Navy Department was actually signed, were, within the meaning of said Act, but incidental to those performed in Texas; and were, therefore, localized in Texas for unemployment compensation tax purposes. This, we think, is true as a matter of law under the undisputed facts. Hence no issue was presented for jury determination.

It is next urged that appellee is estopped to now claim that it was an employer in 1940 and entitled to have that employment considered for experience rating purposes because of its status report made to the Commission in June 1941, accompanied by payment of taxes for the first quarter of 1941, in which report it stated that it had not "previously qualified as a subject employer under the provisions of the Texas Act." The cases relied upon by the Commission that a taxpayer who, by affirmative acts on his part, renders property as his own for taxation, thus making himself liable therefor, may thereafter be estopped to repudiate his rendition in order to escape liability, are not applicable here. A reverse situation is here presented. It could not be urged that denial of ownership, or failure to render, would in anywise relieve anyone who, under the law owed such taxes, from the payment thereof. In the instant case, the Act levies the tax upon those falling within its terms. The status report required of employers subject to such tax is for purposes of registration with the Commission and to enable it to compute such tax and administer the fund. The tax becomes due by an employer coming within the terms of the Act, when facts arise which render him liable, whether he has made any status report at all; and may be collected by suit, if necessary. The status report does not impose the tax, but the existence of the facts prescribed by the law is what determines the liability.

The status report of appellee, relied upon by the Commission on the issue of estoppel showed that the Texas corporation, which has been subject to the Act since January 1940, was its wholly owned subsidiary; that such report did not include the employees of the Texas corporation; and that appellee had during 1940 a minimum of 6 employees, a maximum of 64, and an average of 25, employed in Texas. It thus appears that no information was withheld from the Commission by appellee, no deception practiced, and no false information given. By merely consolidating this report with that of the Texas corporation, the Commission would have had all necessary information. Its failure to do so, and to properly interpret Sec. (f) (4) of the Act, and to demand of appellee the tax due by the two corporations, treated as a single unit, for the last quarter of 1940, cannot, therefore, work an estoppel against appellee.

Again we think another essential element of estoppel is lacking,—that of injury. In any event had the Commission demanded of, and been refused payment by, the appellee of the taxes due by it for 1940, the Act provides the measure of recovery against it,—that is, the tax plus interest and prescribed penalties. All these were tendered into court by appellee and judgment rendered for the Commission for them. In its brief the Commission urges certain contingencies which might have arisen during 1941, 1942, and 1943, had the appellee paid such 1940 taxes when due; but there was no proof made by the Commission that they did arise, or that the unemployment compensation fund suffered any loss by appellee's delinquency which was not fully compensated by the tender made by appellee. Having pleaded estoppel as a defense, the burden to establish it rested upon the Commission. This burden it failed to discharge.

The only other question raised by the Commission which has not been disposed of by the foregoing, is that the suit should have been dismissed because the proof showed that the United States was the real party at interest, and no authority was shown in appellee to bring this suit in its behalf. This, because the proof showed that appellee's contract with the Navy was a cost plus contract; that the taxes paid under protest were paid by appellee as a part of such cost; and that whatever recovery was had should be refunded by the corporation to the Navy Department. This contention is not ten-

able. This was not a suit by, for or against the United States. It is a tax suit involving taxes levied by the State against an employer of labor within the State. No tax was levied, nor could have been levied, against the United States. Nor was any paid by the United States. Whatever interest the United States may have in the recovery is by virtue of a contract with the corporation, and not as an employer nor a taxpayer. The tax was levied by a state law against a private corporation doing business in Texas, and suit for recovery predicated upon a state law relating to state taxes. The State is not concerned with whatever interest, if any, the United States may have in such recovery by appellee. Appellee corporation was the only party who owed the tax, the only one who could appropriately protest its payment, and obviously the proper party to sue for its recovery, without the joinder of any other party who might thereafter assert some interest in the recovery.

For the reasons stated the judgment of the trial court is affirmed.

Affirmed.