# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00704-CV

**OGCI Training, Inc., Appellant**

**v.**

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and
Ken Paxton, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-14-005375, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This interlocutory appeal arises from a franchise-tax protest suit filed in district court by OGCI Training, Inc. ("OGCI") against the Comptroller of Public Accounts. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (permitting interlocutory appeal from order granting or denying plea to jurisdiction by governmental unit). The Comptroller filed a partial plea to the jurisdiction asserting that (1) OGCI's live pleadings included a claim that "[OGCI's] in-person training sessions were performed by third-party contractors, and not OGCI" and (2) OGCI had failed to sufficiently preserve this claim under Chapter 112 of the Texas Tax Code. *See* Tex. Tax Code §§ 112.001-.156 (taxpayers' suits). In addition, the Comptroller sought to dismiss for lack of standing OGCI's "claim" that OGCI had recently filed another amended tax report and that it intended to recover $17,082.88 through that administrative process. After the district court granted the plea, OGCI appealed to this Court.

Because we conclude that OGCI's allegations regarding its intention to seek additional recovery through a separate administrative process do not implicate jurisdictional issues in this suit, we reverse that portion of the district court's order dismissing this "claim." Further, because we conclude that the pleadings do not affirmatively negate jurisdiction over OGCI's claim regarding the use of independent contractors, we reverse the district court's order dismissing this claim and remand the cause to give OGCI the opportunity to replead.

## BACKGROUND

### *Franchise-tax apportionment*

Texas imposes a franchise tax on each taxable entity that does business in this state or that is chartered or organized in this state. *See* Tex. Tax Code § 171.001(a). The franchise tax is a tax on the value and privilege of doing business in Texas. *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47 (Tex. App.—Austin 2013, no pet.). Generally, an entity's tax liability is calculated by first determining the entity's "margin," which is primarily derived from the entity's total revenue, minus any deductions allowed under Chapter 171 of the Tax Code. *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 615 (Tex. 2012) (explaining that "margin" is entity's total revenue minus general deduction); *Newpark Res.*, 422 S.W.3d at 47-48 ("After calculating total revenue, a taxable entity may take one of three general deductions . . . ."); *see also* Tex. Tax Code § 171.1011 (calculation of total revenue). The entity's "taxable margin" is then determined by apportioning the entity's margin to its business in Texas. *See* Tex. Tax Code §§ 171.101(a)(2), .106; *see also In re Nestle*, 387 S.W.3d at 615 (explaining that "taxable margin" is entity's margin multiplied by percentage of gross receipts from Texas business). Finally, the entity's tax liability is calculated

by multiplying the entity's taxable margin by the statutory franchise-tax formula. Tex. Tax Code § 171.002(a) (setting rate of franchise tax as percent of taxable margin).

Apportionment is accomplished by "multiplying [the] business's total margin by an apportionment factor designed to limit the franchise tax to revenue attributable to business in Texas." *Hallmark Mktg. Co. v. Hegar*, 488 S.W.3d 795, 796 (Tex. 2016). The apportionment factor numerator is the taxable entity's gross receipts from business done in Texas and the denominator is the taxable entity's gross receipts from its entire business. *See* Tex. Tax Code § 171.106(a). When a taxable entity derives more of its gross receipts from business in Texas, relative to its total receipts, the entity's apportionment factor increases. Conversely, when that same entity generates less of its gross receipts from business in Texas, its apportionment factor decreases, and assuming its margin is unchanged, its taxable margin decreases. In other words, under Chapter 171 of the Tax Code, doing more business in Texas generally results in higher franchise taxes. *Southwestern Bell Tel. Co. v. Combs*, 270 S.W.3d 249, 258 (Tex. App.—Amarillo 2008, pet. denied).

To determine gross receipts from business done in Texas, a business must include receipts from "each service performed in this state." Tex. Tax Code § 171.103(a)(2). The Comptroller's rules provide that receipts from sales of a service are apportioned to the location where the service is performed. 34 Tex. Admin. Code § 3.591(e)(26) (2017) (Tex. Comptroller of Pub. Accounts, Margin: Apportionment). "It [is] the localization of the transaction in Texas and not the place of physical handing over or receiving of money that [is] significant.*" Westcott Commc'ns Inc. v. Stayhorn*, 104 S.W.3d 141, 146 (Tex. App.—Austin 2003, pet. denied) (quoting *Humble Oil & Refining Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967)). If services are performed

both inside and outside Texas, then such receipts are apportioned as Texas receipts on the basis of the fair value of the services that are rendered in Texas. 34 Tex. Admin. Code § 3.591(e)(26). Consequently, the apportionment factor for services performed in Texas is calculated according to the following formula:

apportionment factor for services = fair value of services performed in Texas/
fair value of services of performed everywhere

*See id.*

***Administrative Proceedings***

OGCI is a foreign corporation headquartered in Tulsa, Oklahoma and authorized to do business in Texas. According to OGCI, it "provides comprehensive educational development services to large petroleum companies." Specifically, OGCI "develop[s] individualized training programs for OGCI's clients' employees that will advance the employees' technical skills," and "develop[s] the curriculum for technical training courses, which are attended by the employees of OGCI's clients." According to OGCI, these services are performed at OGCI's corporate and operational office in Oklahoma. The developed curriculum is later delivered through live-training courses, at least some of which are conducted in Texas.

In its 2009 Texas Franchise Tax report, OGCI reported approximately $35 million in total gross receipts and $10 million in receipts from services performed in Texas. OGCI claimed a cost-of-goods-sold (COGS) deduction and calculated an apportionment factor of 30.32%. The report was reviewed by Comptroller staff, who concluded that OGCI did not qualify for the COGS

4

deduction.[1] The Comptroller staff made no change, however, to OGCI's apportionment factor. The elimination of the COGS deduction resulted in an assessment of $42,058 in additional tax due, plus a penalty of $4,206 and interest. *See* Tex. Tax. Code § 111.008.

OGCI filed an administrative petition for redetermination, *see id.* § 111.009(a), which was heard on the parties' written submissions by an administrative law judge (ALJ) with the State Office of Administrative Hearings (SOAH), *id.* §§ 111.009(c), .00455. In these proceedings, OGCI conceded that it was not entitled to the COGS deduction. However, OGCI asserted that its tax liability was nevertheless overstated because OGCI had made an error in its 2009 Texas Franchise Tax report with respect to the apportionment factor. In its Statement of Grounds for redetermination, OGCI argued that it had "erroneously sourced a significant amount of OGCI's receipts to Texas" by failing to utilize a cost-of-performance analysis to determine the fair market value of services rendered in Texas.[2] OGCI explained that its "services are performed both inside and outside of Texas" and that "[its] Oklahoma corporate office directs the activities of the Company's

---

[1]   An entity that provides goods may take a COGS deduction for "'all direct costs of acquiring or producing the goods,' some indirect costs like insurance, utilities and quality control, and up to 4% of other 'indirect or administrative overhead costs.'" *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47-48 (Tex. App.—Austin 2013, no pet.) (summarizing COGS deduction); *see* Tex. Tax Code § 171.1012 (COGS deduction). The Comptroller determined that OGCI provides services rather than goods and, consequently, does not qualify for the COGS deduction.

[2]   According to OGCI, the cost-of-performance method has previously been recognized by the Comptroller in similar cases as a valid method for apportioning service revenue. *See, e.g.*, Hearing Decision No. 13,734, Texas Comptroller of Public Accounts (February 24, 1983); Letter No. 200807139L, Texas Comptroller of Public Accounts (July 24, 2008). OGCI describes the apportionment factor for services as a ratio of the costs attributable to performance in Texas compared to the costs attributable to services performed everywhere. In deciding the jurisdictional issue before us, we do not consider the merits of any of OGCI's underlying claims and express no opinion on the validity of the cost-of-performance method or the applicability of this method to the facts alleged.

5

multi-state training offerings, inclusive of those in Texas, providing support, marketing, and the overall development and creation of the OGCI training materials." OGCI requested permission to recalculate its apportionment factor to account for the costs attributable to its services performed in Oklahoma for the 2009 tax year, which according to OGCI were substantial compared to those costs attributable to its services performed in Texas.

The ALJ issued its proposal for decision, which the Comptroller approved and adopted in all respects as his final decision. In his decision, the Comptroller rejected OGCI's argument that an adjustment of the apportionment factor was necessary with respect to the training services in Texas. In part, the Comptroller concluded that OGCI's live-training sessions were wholly performed in Texas and that no apportionment to account for OGCI's activities in Oklahoma was necessary. *See id*. § 171.103(a)(2). As a result, under the Comptroller's decision, *all* of the receipts generated by the live-training sessions in Texas qualified as "receipts from business done in Texas." *See* 34 Tex. Admin. Code § 3.591(e)(26) (explaining that apportionment is necessary based on fair value of services when services are performed both inside and outside of Texas). In his decision, the Comptroller explained that:

> A receipt will be considered a Texas receipt if "the act done or the property producing the income must be located in Texas." *Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967). Services performed within Texas are units of service sold, the performance of which occurs within Texas, and the focus is on the specific, end-product acts for which the customer contracts and pays to receive, not on nonreceipt-producing, albeit, essential, support activities. *See* Comptroller's Decision No. 10,028 (1980).
>
> . . . .

6

. . . The training services at issue were provided in Texas. [OGCI]'s Oklahoma headquarters was involved in preparing and marketing the services, but the "act done" that produced the revenues at issue was performed completely in Texas. The acts done at [OGCI]'s headquarters were undoubtably necessary and essential to the creating and marketing of the training services it sold in 2009. However, [OGCI] conflates what were essentially preparatory, non-receipt producing acts that were necessary to create a sellable product with the act that was done to produce the receipts at issue. [OGCI]'s "cost allocation" argument is not consistent with the methodology outlined by the Tax Policy Division. More importantly, the argument is not consistent with the requirements of Texas Tax Code Chapter 171.

### *Franchise-Tax Protest Suit*

On September 24, 2014, OGCI paid the full amount of the assessed tax under protest and attached a protest letter outlining its reasons for recovering payment. *See* Tex. Tax Code § 112.051 (authorizing protest payment). OGCI then filed suit to recover the protest payment, as permitted by section 112.052 of the Tax Code. *See id.* § 112.052 (authorizing taxpayer suit after payment under protest).

The Comptroller filed a partial plea to the jurisdiction, requesting that the district court dismiss OGCI's franchise-tax protest suit to the extent OGCI was attempting to raise a ground in the district court proceedings that it had not adequately preserved. Specifically, the Comptroller challenged allegations in OGCI's petition stating that the creation of the course materials and the live delivery of the courses in Texas is completed by third-party instructors under a contractual agreement with OGCI. The Comptroller argued that this ground—"that third-party contractors, rather than OGCI, had performed in Texas"—amounted to a new or different ground that OGCI had not presented in its protest letter and that, consequently, the district court did not have jurisdiction to consider. The Comptroller also complained that OGCI lacked standing to state in its petition that it had

7

filed an amended franchise-tax report reflecting an additional overpayment that "is not part of the instant protest claim" and that OGCI intended to recover this overpayment in a separate refund suit.

In response, OGCI argued that the requested relief and the grounds for recovery presented in its petition remained the same as those presented in its protest letter. OGCI explained that its factual allegations concerning OGCI's use of independent instructors simply supported OGCI's consistently made argument that "the Comptroller's apportionment theory improperly ignores the true nature of its work, most of which is performed . . . in Oklahoma." With respect to OGCI's allegations regarding the amended franchise-tax report and additional overpayment, OGCI explained that it is seeking recovery of that overpayment in a separate, subsequent proceeding—not in this proceeding—and that "the fact [was] included in OGCI's petition simply to put the Comptroller on notice of this separate claim." Thus, according to OGCI, "the concepts of standing and ripeness . . . are inapplicable to this statement."

The district court granted the Comptroller's partial plea to the jurisdiction, concluding that it "lacks subject-matter jurisdiction over paragraphs numbered 17 and 54 in Plaintiff's Second Amended Petition" and that "it lacks subject-matter jurisdiction over Plaintiff's claim seeking recovery on the grounds that its live-training sessions were delivered or performed by third-party or independent contractors."[3]

---

[3] Paragraph 17 states, "OGCI filed the amended Texas Franchise Tax Report with the Texas Comptroller of Public Accounts as an administrative refund claim seeking to recover $17,082.88 in additional franchise tax, plus interest thereon, for report year 2009. OGCI intends to recover the $17,082.88 through the administrative process and addresses it herein solely for the purpose of notifying Defendants of the existence of the administrative refund claim. The $17,082.88 is in addition to the amount sought in this state court proceeding." Paragraph 54 states, "The Risk/Reward instructors' receipt-producing activities arise from writing the course materials and delivering the

8

**DISCUSSION**

*Standard of Review*

On appeal, OGCI asserts that the district court erred in granting the Comptroller's plea to the jurisdiction. A plea to the jurisdiction is a dilatory plea that challenges the district court's subject-matter jurisdiction over a case without regard to whether the claims have merit. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2006); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Because whether a court has subject-matter jurisdiction is a question of law, we review a trial court's ruling on a plea to the jurisdiction under a de novo standard of review. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016).

In reviewing a trial court's ruling on a plea to the jurisdiction, we begin our analysis with the plaintiff's live pleadings and determine whether the facts alleged affirmatively demonstrate that jurisdiction exists. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We construe the plaintiff's pleadings liberally, taking all factual assertions as true and looking to the plaintiff's intent. *Id.* If the pleadings fail to allege sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Id.* at 226-27. However, "if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the [plaintiff] the opportunity to amend." *Id.* at 227.

---

course at the live training sessions. In contrast, OGCI's receipt-producing activities arise from the services OGCI provides outside of Texas both before and after the courses are delivered by the Risk/Reward instructors."

9

To the extent resolution of the jurisdictional issues in this case turns on statutory construction, we also review these questions de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Iliff v. Iliff*, 339 S.W.3d 74, 79 (Tex. 2011); *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868 (Tex. 2009). In ascertaining that intent, we rely on the plain meaning of the words in the statute "unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to 'absurd results.'" *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code § 311.011. "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

### Subject-Matter Jurisdiction in Protest-Payment Suits

Sovereign immunity protects the State and its agencies from lawsuits unless the State, through its legislature, expressly consents to the suit. *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002). In the absence of a clear, unambiguous waiver, sovereign immunity deprives Texas courts of subject-matter jurisdiction. *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006). Section 112.052 of the Tax Code operates as a waiver of the State's immunity in franchise-tax protest suits, so long as the taxpayer strictly complies with the statute's administrative and procedural requirements. *See Sanadco Inc. v. Office of the Comptroller of Pub. Accounts*, No. 03-11-00462-CV, 2015 WL 1478200, at *5 (Tex. App.—Austin Mar. 25, 2015, pet. denied) (mem. op.) (citing *In re Nestle*, 359 S.W.3d at 211).

Under section 112.052, a taxpayer seeking to initiate a franchise-tax protest suit must first pay the amount assessed and submit with the tax payment a protest letter. Tex. Tax Code § 112.052. The taxpayer must then file suit within 90 days of the date the protest payment is made. *Id.* With respect to the protest letter, section 112.051 states, "The protest must be in writing and must state fully and in detail each reason for recovering the payment." *Id*. § 112.051(b). Under section 112.053, the issues to be determined in the protest-payment suit are "limited to those arising from the reasons expressed in the written protest as originally filed." *Id.* § 112.053(b).

As this Court has explained, the franchise-tax protest statute's requirements serve two purposes. *See Lawrence Indus., Inc. v. Sharp*, 890 S.W.2d 886, 892 (Tex. App.—Austin 1994, no writ). First, the requirements allow the Comptroller the first opportunity to determine the merits and validity of the taxpayer's protest. *Id*. (citing *James v. Consolidated Steel Corp.*, 195 S.W.2d 955, 962 (Tex. Civ. App.—Austin 1946, writ ref'd n.r.e.)). Second, the statute's requirements "prevent the taxpayer, after he files suit, from changing to or asserting upon the trial court other or different grounds from those stated in his protest." *Consolidated Steel Corp.*, 195 S.W.2d at 962. In other words, the requirements "prevent [the taxpayer] after making protest from subsequently taking advantage of the collecting agency upon such trial by 'changing horses.'" *Id.*; *see Local Neon Co., Inc. v. Strayhorn*, No. 03-04-00261-CV, 2005 WL 1412171, at *5 (Tex. App.—Austin June 16, 2005, no pet.) (mem. op.) (quoting *Consolidated Steel Corp.*, 195 S.W.2d at 962). A protest letter is sufficient under section 112.051 when it puts the Comptroller on notice of the legal basis for the taxpayer's claim, *see Hegar v. Ryan*, No. 03-13-00400-CV, 2015 WL 3393917, at *10 (Tex. App.—Austin May 20, 2015, no pet.) (mem. op.), without requiring the protesting taxpayer to state

11

all the evidence on which he relies to support that legal basis, *see Consolidated Steel Corp.*, 195 S.W.2d at 962.

In this case, there is no dispute that OGCI's protest letter is sufficiently detailed and generally meets the requirements of section 112.051, at least with respect to the grounds raised. Instead, the issue before this Court, as it was before the district court, is whether OGCI, in its protest suit, has asked the district court to decide issues that "aris[e] from the reasons expressed in [its] written protest." *See* Tex. Tax Code § 112.053. To the extent OGCI's issues do not "arise from the reasons expressed in [OGCI's] written protest," the district court is without jurisdiction to resolve those issues. As a result, we begin our jurisdictional analysis by reviewing OGCI's protest letter and its stated reasons for recovery.

In its protest letter, OGCI argued that the assessed tax was incorrect because "the undisputed factual record demonstrates that OGCI performs receipt-producing activities both in Oklahoma and Texas, and the Tax Claim therefore fails to properly apportion OGCI's receipt-producing activities." As it had done in the administrative proceedings that preceded OGCI's protest payment, OGCI challenged the Comptroller's conclusion that the training services were wholly in Texas and the Comptroller's characterization of OGCI's Oklahoma services as merely "support activities." In its protest letter, OGCI stated the following:

> Characterizing OGCI's services as solely the live training sessions OGCI provides in Texas, as the Comptroller does, ignores the undisputed factual record which conclusively establishes that the live training sessions are only a part of the services OGCI's clients pay OGCI to provide. The content of OGCI's training services—the core of what OGCI's clients are paying for—is developed in OGCI's Oklahoma operational center.

12

. . . .

> . . . The basis for the Tax Claim, by placing an exclusive focus on OGCI's live training in Texas, ignores an essential part of the services provided by OGCI to its clients. OGCI's receipt-producing activity is not solely the live training it offers; it is also the creation of the content of the training and of the training materials in a series of integrated, interdependent steps to the satisfaction of OGCI's clients. The most significant portion of OGCI's performance, in fact, is the development of content and thought leadership for its training and instructional materials; the in-person training serves as a delivery vehicle for this content and thought leadership.

OGCI explained that because receipt-producing acts were also performed in Oklahoma, "the fair value of the services rendered in Texas must be determined" by calculating the "ratio of the costs incurred in performing the service inside of Texas to the costs incurred in performing outside of Texas." "Applied to the current matter," OGCI states, "the costs of performance approach . . . clearly establishes that the majority of OGCI's costs to develop its training programs was incurred in Oklahoma." Specifically, OGCI asserted that it "incurred 61% of the costs for developing its training programs in Oklahoma and only 39% of the costs in Texas." In summary, OGCI's complaint to the Comptroller was two-fold: (1) that the Comptroller had erroneously concluded that the live-training sessions performed in Texas were the only receipt-producing services provided by OGCI, and (2) that the Comptroller should have instead apportioned OGCI's training receipts as Texas and non-Texas receipts and should have done so by comparing the costs attributable to the services provided in Texas to the costs attributable to services provided outside of Texas.

Now, in its protest suit in district court, OGCI alleges that the live-training sessions in Texas are carried out by independent, third-party instructors. Under the "Facts" section in its petition, OGCI alleges that it "enters into arrangements with the [third-party] instructors to create the course materials and to deliver the course and update the course materials as necessary" and

13

that "OGCI refers to instructors as Risk/Reward instructors because both OGCI and the instructors incur costs to develop the courses and both are compensated for their services only if the courses are profitable." "Under the Risk-Reward arrangements, the instructors receive 2/3 of the net income from the course as compensation for writing the course materials and delivering the course. OGCI receives 1/3 of the net income from the course as partial compensation for the comprehensive educational services OGCI provides." "OGCI performs its services (i.e, the revenue-producing activities) to develop the individualized training programs and to develop the course curriculum primarily in Tulsa, Oklahoma."

OGCI's petition also includes a section labeled as "Count I" with the subheading "The Assessed Tax Fails to Properly Apportion OGCI's Taxable Margin." In paragraphs 50 to 57 of "Count I," OGCI alleges that the Comptroller failed to properly apportion OGCI's taxable margin because the Comptroller should have calculated OGCI's apportionment factor to account for the value of its services performed outside of Texas. Included among these paragraphs is paragraph 54, which states:

> The Risk/Reward instructors' receipt-producing activities arise from writing the course materials and delivering the course at the live training sessions. In contrast, OGCI's receipt-producing activities arise from the services OGCI provides outside of Texas both before and after the courses are delivered by the Risk/Reward instructors.

The trial court granted the Comptroller's partial plea to the jurisdiction specifically as to paragraph 54 and to OGCI's "claim seeking recovery on the grounds that its live-training sessions were delivered or performed by third-party or independent contractors."

OGCI argues that the district court erred in its jurisdictional ruling because OGCI's allegations concerning its use of the third-party instructors fall squarely within the scope of the district court's jurisdiction under section 112.053. According to OGCI, section 112.053, when properly construed, requires only "consistency between the legal grounds or theories presented at the administrative level and the judicial level" and the legislature "did not intend to require that every fact supporting those theories be stated exactly the same at both levels." OGCI contends that the legal ground or theory presented both to the Comptroller and to the district court is that the Comptroller should have apportioned most of OGCI's revenue to Oklahoma utilizing the cost-of-performance method because that is where most of OGCI's receipt-producing activities are performed. OGCI argues that its live pleadings before the district court, including its factual allegations concerning its use of third-party instructors, are wholly consistent with this theory.

In response, the Comptroller acknowledges that section 112.053 "allows for additional factual development and further refinement of the legal issues," but asserts that the reason "given [by OGCI in its protest letter] in support of its challenge to the amount of Texas receipts [is] entirely different from the one now set out in its live pleadings." The Comptroller argues that the "reason" given by OGCI in its protest letter is that OGCI performed some of its receipt-producing services in Oklahoma and that the Comptroller should have apportioned OGCI's receipts from the training sessions in Texas by using the cost-of-performance formula, whereas OGCI is now "asserting for the first time that the live training sessions in Texas were not provided by OGCI at all." According to the Comptroller, the district court does not have jurisdiction to consider this new issue because it does not "arise from" the reasons set out in OGCI's protest letter. *See* Tex. Tax Code § 112.053(b).

15

The Comptroller construes paragraph 54 as a contention that the live-training sessions in Texas do not constitute receipt-producing services of OGCI at all because these services are performed entirely by third-party instructors, not by OGCI. If this construction were correct, we would agree that this legal ground for protest is inconsistent with the grounds stated in OGCI's protest letter, which focused on the Comptroller's characterization of OGCI's training sessions in Texas as OGCI's only receipt-producing act. Under the Comptroller's construction of paragraph 54, OGCI would have, in effect, shifted to an argument that it produced no receipts from the live-training sessions in Texas, rather than merely claiming that the Comptroller failed to also account for the value of its out-of-state services. Viewed under this construction, the Comptroller's position and the trial court's ruling are reasonable. *See Hegar v. Sunstate Equip.* Co., No. 03-15-00738-CV, 2017 WL 279602, at \*8 (Tex. App.—Austin Jan. 20, 2017, pet. filed) (mem. op.) (concluding that complaint regarding tax rate could not be raised because it was not referenced in protest letter). This potential interpretation of paragraph 54, however, does not end the inquiry.

We must, under the applicable standard of review, construe OGCI's pleadings liberally while looking to OGCI's intent. *See Miranda*, 133 S.W.3d at 226. When viewed in that light, we cannot conclude that OGCI's pleadings affirmatively negate jurisdiction. Paragraph 54, as discussed above, is part of a larger "Count I" in which OGCI takes issue with the Comptroller's calculation of its apportionment factor. When paragraph 54 is read in context with the other paragraphs in Count I and the second amended petition as a whole, it appears that OGCI may, in fact, have intended to plead a legal basis that comes within the scope of its protest letter. For example, in paragraph 55, OGCI explains that "[its] receipt-producing activities occur both in Texas and

16

outside of Texas" and that Texas law requires that the Comptroller apportion OGCI's Texas receipts based on their fair value. In addition, in paragraphs 41 to 44, OGCI explains the role of the "Risk/Reward" instructors and details how those instructors receive two-thirds of the net income from a particular course, while OGCI receives one-third of the net income. Read in context, it appears that OGCI's intent in paragraph 54 may have been to explain that its apportionment factor should be lowered to reflect the fact that OGCI's receipt-producing activities occur primarily outside of Texas and that it receives only one-third of the receipts from the training sessions performed in Texas.

Construed liberally, as we must, paragraph 54 would not be inconsistent with the complaint OGCI made in its protest letter. To the extent OGCI now claims that its income arrangements with its third-party instructors impact the calculations of its gross receipts, of its costs, and ultimately of its apportionment factor, we conclude that this issue does "arise" from the reasons presented in OGCI's protest letter. These issues—how much OGCI collects from the training sessions in Texas and how any apportionment of that revenue should be calculated—reasonably relate to and are wholly consistent with the legal basis presented by OGCI in its protest letter concerning the calculation of its apportionment factor. *See Suleman v. McBeath*, 614 S.W.2d 637, 639-40 (Tex. Civ. App.—Texarkana 1981, writ ref'd n.r.e.) (concluding that protest letter claiming that "tax computation was erroneous" was sufficient to give trial court jurisdiction over computational issues and that court could decide in pre-trial and trial proceedings whether certain evidence should be admitted in support of claim); *see also Consolidated Steel Corp.*, 195 S.W.2d at 962 (concluding that protest letter that informed Commission that "[protestant] predicated its protest on specific provisions of the law [and] providing the method of computation" was sufficiently detailed and that "it was not necessary for the protestant to state all of the evidence on which it relied").

17

Accordingly, although OGCI did not affirmatively demonstrate facts that establish jurisdiction under Chapter 112 in paragraph 54, its pleadings do not affirmatively demonstrate incurable defects in jurisdiction. *See Miranda*, 133 S.W.3d at 226-27. The issue at this stage of the proceedings is one of pleading sufficiency, and the Comptroller has neither asserted nor demonstrated that OGCI had a full and fair opportunity to amend its pleadings in the district court. *See id.* We conclude that OGCI should be afforded the opportunity to amend its pleadings to address these jurisdictional concerns.

Finally, we consider OGCI's argument that the district court erred in dismissing OGCI's "claim," set out in paragraph 17 of its live pleadings, that OGCI had filed an amended franchise-tax report reflecting an additional overpayment that "is not part of the instant protest claim." In its plea to the jurisdiction, the Comptroller argued that OGCI did not have standing to assert what the Comptroller considers to be "a hypothetical administrative claim." The district court agreed and struck the allegations from OGCI's petition. On appeal, OGCI argues that the trial court erred in striking the statement because it was "simply a background fact notifying the Comptroller and the court about the existence of this claim" and because OGCI is not seeking any relief regarding this overpayment in this proceeding.[4] Although the relevance of OGCI's allegations regarding the additional overpayment and the separate administrative proceeding is unclear, we agree that because OGCI is not seeking any relief for the injury in this proceeding, the propriety of the allegations is not a jurisdictional issue. *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 155-56 (Tex. 2012) (explaining that to satisfy redressability requirement of standing, plaintiff must establish substantial

---

[4] In his response brief, the Comptroller does not make any argument in support of the district court's decision to strike this statement from OGCI's pleading.

18

likelihood that requested relief will remedy alleged injury in fact). We conclude that the district court erred in concluding that it did not have jurisdiction over the allegations made by OGCI in paragraph 17 of its petition.

## CONCLUSION

Because we have concluded that the district court erred in granting the Comptroller's plea to the jurisdiction, we reverse the district court's order and remand this cause for further proceedings, including an opportunity for OGCI to replead.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Field and Bourland

Filed: October 27, 2017

Reversed and Remanded

19